Opinion issued November 26, 2008 


 

 












In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-07-00899-CV

____________


SALLY LIU, Appellant


V.


DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, Appellee






On Appeal from the 315th District Court

Harris County, Texas

Trial Court Cause No. 2006-02615J






O P I N I O N


 In this accelerated appeal of a three week jury trial, (1) appellant, Sally Liu
("Sally"), challenges the trial court's decree, terminating her parental rights to her
minor child, R.L. (2) In two issues, Sally contends that the evidence is legally and
factually insufficient to support the jury's verdict that (1) she knowingly placed or
knowingly allowed R.L. to remain in conditions or surroundings that endangered his
physical or emotional well-being; (3) (2) she engaged in conduct or knowingly placed
R.L. with persons who engaged in conduct that endangered his physical or emotional
well-being; (4) (3) she had a mental or emotional illness or a mental deficiency that
rendered her unable to provide for the physical, emotional, and mental needs of R.L.
until his eighteenth birthday; (5) and (4) termination of her parental rights was in the
best interest of the child. (6) We affirm.Background Sally is the biological mother of R.L., who was two and a half years old at the
time of trial. Sally, who was born in China, suffers from schizophrenia, has been
hospitalized numerous times due to her mental illness, and has been prescribed
medication for her condition. Sally lived in Texas from the time that she arrived from
China at age 15 until 2002, when she moved to Arizona. While Sally lived in
Arizona, a court appointed her mother, Situ H. Liu ("Situ"), and her sister, Connie
Diep ("Connie"), co-guardians over her. (7)

 Sally moved back to Houston in 2004 and, with some interruptions, lived in a
condominium that her sister had purchased until approximately the time of trial. (8) On
February 22, 2005, Sally gave birth to R.L. 

 Before moving to Arizona, starting in 1999, Sally began receiving mental-health services, medication, and monitoring from the Mental Health-Mental
Retardation Authority of Harris County ("MHMRA"). In September 2005, after
Sally's return to Texas, an MHMRA screening report indicated that Sally was
experiencing "psychotic symptoms" and "stress from her baby boy" and that she was
"suicidal and feels she wants to harm others if she does not take her medication." An
MHMRA treatment plan indicated that Sally was delusional, paranoid, and suspicious
of others.

 On October 6, 2005, while at an MHMRA appointment, Sally began cursing
at Situ and would not let Situ care for R.L., who at the time was eight months old. 
Sally's psychiatric assessment that day indicated that her "presenting problem"
included "violent behavior" and noncompliance with medication. The Texas
Department of Family and Protective Services ("DFPS") was called after Sally's
mother had made a statement that Sally was not changing R.L.'s diapers properly and
that she did not know whether Sally was providing R.L. with necessary medication
or food. The DFPS case was assigned to Phyllis Charles ("Charles"), the family's
caseworker, on October 23, 2005. Sally was subsequently committed to in-patient
care on an involuntary basis. The MHMRA treatment plan for Sally's involuntary
hospitalization reflected that Sally was a "[d]anger to herself [and] others." The
"Treatment Plan Review Results" noted that Sally was "delusional" and "paranoid"
and that Sally's compliance with her medication regimen was "questionable." 

 In February 2006, Sally was again admitted to the hospital for attacking a
grocery store clerk who Sally thought was trying to steal from her. While Sally was
in the hospital, Charles attempted to visit Sally at home; being unsuccessful, she left
a message on Sally's door in English and Cantonese. Charles subsequently visited
Sally in the mental-health facility to which Sally had been admitted. When Charles
tried to speak to Sally at the facility, Sally proceeded to talk about Charles's genitals. 
Sally then instructed her social worker to have sex with Charles and shouted
obscenities. At that point, Charles determined that Sally did not appear able to care
for R.L. 

 On March 7, 2006, Sally was transferred to Rusk Hospital. On March 8, 2006,
Charles and an interpreter made a home visit to see R.L. Charles spoke to Situ and
Situ's other daughter, Ling Liu ("Ling"), explaining that it would not be in R.L.'s best
interest for Sally to remain in their home with R.L. because of Sally's odd behavior. 
Situ stated that her daughter was a good parent and that Sally would not hurt R.L.
because she loved the baby. According to Charles, both Situ and Ling stated that
Sally would not have attacked the grocery store clerk had the clerk been nice to Sally
and not made Sally angry. 

 DFPS removed R.L. on March 9, 2006 and was appointed R.L.'s temporary
sole managing conservator. Charles asked Situ whether there were other relatives
with whom R.L. could be placed. Situ called William Bau ("Bau"), R.L.'s father,
who lived in Arizona. Charles spoke with Bau and told him that DFPS was taking
custody of R.L. Bau told Charles that he did not understand why DFPS would
remove R.L. from Sally and stated that he would be willing to go to the emergency
removal hearing in Texas. R.L. was then placed in temporary foster care. Charles
testified that none of R.L.'s family members were present at the emergency removal
hearing and that, at the time R.L. was removed, DFPS did not have proof of Bau's
paternity. 

 The termination case was tried before a jury in August and September 2007. 
Ten members of a 12-person jury voted to terminate Sally's parental rights to R.L.,
and the trial court rendered judgment on the jury verdict. The judgment granted Roy
and Melanie Young, R.L.'s foster parents, managing conservatorship of R.L.

 Sally timely filed a motion for new trial, a statement of appellate points, and
a notice of appeal. Among the issues Sally identified in her statement of points were
legal and factual sufficiency challenges to the predicate and best-interest findings
supporting termination. The trial court denied Sally's motion for new trial and found
Sally's appeal not to be frivolous. See Tex. Fam. Code Ann. § 263.405(d) (Vernon
Supp. 2008).

Legal and Factual Sufficiency Challenges


 Sally does not dispute that she suffers from schizophrenia. Instead, she
contends that DFPS has failed to establish by clear and convincing evidence (1) that
she cannot meet the physical, emotional, and mental needs of R.L. and that she will
remain incapable of providing for those needs until R.L. reaches the age of 18; (2)
that she has engaged in any one of the acts or omissions listed in section 161.001 of
the Texas Family Code; and (3) that termination of her parental rights is in the best
interest of R.L. See Tex. Fam. Code Ann. §§ 161.001(1),(2) (Vernon Supp. 2008),
161.003(a) (Vernon 2002).

 Initially, we note that this case is not about the appointment of the Youngs as
conservators, because Sally does not challenge this aspect of the judgment; rather,
Sally challenges only the termination. This case is also not about whether Bau or
Sally's family should have been appointed conservators, because, again, Sally does
not challenge the conservatorship ruling separately. (9) Finally, this case is not about
the emergency removal of R.L., language barriers, or whether Situ, the Dieps, Ling,
or the extended family understood the CPS system because that issue is not before
this Court to decide. 

A. Standards of Review

 The burden of proof at trial in a termination-of-parental-rights case is by clear
and convincing evidence. Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2008);
In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence'"
means the measure or degree of proof that will produce in the mind of the trier of fact
a firm belief or conviction as to the truth of the allegations sought to be established." 
Id. § 101.007 (Vernon 2002); In re J.F.C., 96 S.W.3d at 264. This heightened burden
of proof results in a heightened standard of review.

 When determining legal sufficiency, we review all the evidence in the light
most favorable to the finding "to determine whether a reasonable trier of fact could
have formed a firm belief or conviction that its finding was true." In re J.F.C., 96
S.W.3d at 266. To give appropriate deference to the factfinder's conclusions, we
must assume that the factfinder resolved disputed facts in favor of its finding if a
reasonable factfinder could do so. Id. We disregard all evidence that a reasonable
factfinder could have disbelieved or found to have been incredible. Id. This does not
mean that we must disregard all evidence that does not support the finding. Id. 
Disregarding undisputed facts that do not support the finding could skew our analysis
of whether there is clear and convincing evidence. Id. Therefore, in conducting a
legal-sufficiency review in a termination-of-parental-rights case, we must consider
all of the evidence, not only that which favors the verdict. See City of Keller v.
Wilson, 168 S.W.3d 802, 817 (Tex. 2005).

 In determining a factual-sufficiency challenge, the higher burden of proof in
termination cases also alters the appellate standard of review. In re C.H., 89 S.W.3d
17, 26 (Tex. 2002). "[A] finding that must be based on clear and convincing evidence
cannot be viewed on appeal the same as one that may be sustained on a mere
preponderance." Id. at 25. In considering whether evidence rises to the level of being
clear and convincing, we must consider whether the evidence is sufficiently
reasonable to form in the mind of the factfinder a firm belief or conviction as to the
truth of the allegation sought to be established. Id. We consider whether disputed
evidence is such that a reasonable factfinder could not have resolved that disputed
evidence in favor of its finding. In re J.F.C., 96 S.W.3d at 266. "If, in light of the
entire record, the disputed evidence that a reasonable factfinder could not have
credited in favor of the finding is so significant that a factfinder could not reasonably
have formed a firm belief or conviction, then the evidence is factually insufficient." 
Id.

 The natural rights that exist between parents and their children are of
constitutional dimension. Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985). 
Therefore, termination proceedings should be strictly scrutinized, and the involuntary
termination statutes should be strictly construed in favor of the parent. Id. at 20-21. 
However, "[j]ust as it is imperative for courts to recognize the constitutional
underpinnings of the parent-child relationship, it is also essential that the emotional
and physical interests of the child not be sacrificed merely to preserve that right." In
re C.H., 89 S.W.3d at 26.

B. Statutory Grounds for Termination

 1. Texas Family Code Section 161.003

 Section 161.003 of the Texas Family Code permits termination of parental
rights due to the mental illness of the parent, provided that (1) the illness renders the
parent unable to care for the child's physical, emotional, and mental needs, (2) the
illness will continue to render the parent unable to provide for the child's needs until
the child's eighteenth birthday, (3) DFPS has been the temporary or sole managing
conservator of the child for the six months preceding the filing of the termination
petition, (4) DFPS has made reasonable efforts to return the child to the parent, and
(5) termination is in the best interest of the child. See Tex. Fam. Code Ann.
§161.003 (Vernon 2002).

 2. Texas Family Code Section 161.001

 In proceedings to terminate the parent-child relationship brought under section
161.001 of the Texas Family Code, DFPS must establish by clear and convincing
evidence (1) that one or more of the acts or omissions enumerated under subsection
(1) of section 161.001 exists and (2) that termination is in the best interest of the
child. See Tex. Fam. Code Ann. §161.001 (Vernon Supp. 2008). Both elements
must be established, and termination may not be based solely on the best interest of
the child. Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). 
We note that, pursuant to the statute, there need only be proof of one predicate ground
of parental misconduct under section 161.001(1) of the Family Code to support a
judgment of termination when there is also a finding that termination is in the child's
best interest. See In re J.F.C., 96 S.W.3d at 261.

C. The Judgment

 The judgment recites that the jury found by clear and convincing evidence that
terminating Sally's parental rights was in R.L.'s best interest. The judgment further
recites that the jury found, by clear and convincing evidence, that Sally: 

 1. knowingly placed or knowingly allowed [R.L.] to remain in
conditions or surroundings which endangered the physical or
emotional well being of R.L., or 


 2. engaged in conduct or knowingly placed [R.L.] with persons who
engaged in conduct which endangered the physical or emotional
well-being of [R.L.], or 


 3. failed to comply with the provisions of a court order that
specifically established the actions necessary for [Sally] to obtain
the return of [R.L.] who has been in the permanent or temporary
managing conservatorship of the Department of Protective and
Regulatory Services for not less than nine months as a result of
[R.L.'s] removal from [Sally] under Chapter 262 (Procedures in
Suit by Governmental Entity) for the abuse or neglect of the child,
or 


 4. [Sally] has a mental or emotional illness or a mental deficiency
that renders [Sally] unable to provide for the physical, emotional,
and mental needs of [R.L.]; the illness or deficiency, in all
reasonable probability, proved by clear and convincing evidence,
will continue to render [Sally] unable to provide for [R.L.'s]
needs until the eighteenth birthday of [R.L.], [TDFPS] has been
the temporary or sole managing conservator of [R.L.], [Sally's]
child for at least six months preceding the date of the hearing on
the termination held in accordance with subsection (c), [TDFPS]
has made reasonable efforts to return [R.L.] to [Sally]. 

D. Sufficiency of the Evidence Supporting Termination Under Section
161.003 (Mental Illness)


 Sally does not contest that she is mentally ill or that DFPS had been the
temporary managing conservator of R.L. for the six months preceding the filing of the
petition. However, under part of issue one, Sally asserts that the evidence is legally
and factually insufficient to show (1) that Sally's mental illness renders her unable
to provide for R.L.'s physical, emotional, and mental needs, (2) that Sally's mental
illness would continue to render her unable to provide for R.L.'s needs until his
eighteenth birthday, and (3) that DFPS made reasonable efforts to return R.L. to
Sally. (10) See Tex. Fam. Code Ann. § 161.003(a)(1), (2), (4).

 1. Legal Sufficiency

 In our legal-sufficiency review, we consider all of the evidence in the light
most favorable to the three challenged findings to determine whether a reasonable
jury could have formed a firm belief or conviction that the three findings were true. 
See In re J.F.C., 96 S.W.3d at 266. 

 a. Sally's ability to care for R.L.'s needs through his eighteenth
birthday (Texas Family Code section 161.003(a)(1)-(2))


 Mental illness of a parent is not, in and of itself, grounds for termination of the
parent-child relationship. See Carter v. Dallas County Child Welfare Unit, 532
S.W.2d 140, 141-42 (Tex. Civ. App.--Dallas 1975, no writ). The issue is whether
Sally's mental illness renders her unable to provide for R.L. now and, with reasonable
probability, until his 18th birthday. Salas v. Tex. Dep't of Protective & Regulatory
Servs., 71 S.W.3d 783, 790 (Tex. App--El Paso 2002, no pet.) DFPS need not prove
with certainty that the parent's mental disease will continue to render the parent
unable to provide for the child's needs until the child's 18th birthday; rather, DFPS
must show, by clear and convincing evidence, that the mental illness in all probability
will do so. Salas, 71 S.W.3d at 790 "In all reasonable probability" does not mean
beyond a reasonable doubt and does not require "scientific certainty" that the parent's
mental illness will continue until the child is 18. Salas, 71 S.W.3d at 790; In the
interest of C.D. and B.P., 962 S.W.2d 145, 148 (Tex. App.--Fort Worth 1998, no
pet.).

 In Spurlock v. Tex. Dep't of Protective and Regulatory Servs., the Austin Court
of Appeals was confronted with a case involving a schizophrenic mother and two
young children. 904 S.W.2d 152 (Tex. App.--Austin 1995, writ denied.) The court
found that the Department had met its burden of establishing, by clear and convincing
evidence, that Spurlock could not meet the physical, emotional, and mental needs of
her children and that she would remain incapable of providing for those needs until
the children reached the age of eighteen, and that termination was in the best interest
of the children. Spurlock, 904 S.W.2d at 156. Spurlock had suffered from serious
mental health problems for nine years. Id. at 157. Spurlock's mental illness had
forced her to be hospitalized numerous times and she had a history of noncompliance
with her medication. Id. Spurlock's doctor testified that her condition would not
resolve itself with time, she could not meet her own needs or the needs of her
children, and, if she discontinued her medication, she would need hospitalization
again. Id. Moreover, a DFPS caseworker testified that, during Spurlock's supervised
visits with her children, Spurlock did not appear to be aware of their needs. Id. at
156. After considering and weighing these factors, the court concluded the evidence
was both legally and factually sufficient to support the durational requirement. Id.
at 156-57. 

 Similarly, the San Antonio Court of Appeals held that a parent's refusal to
follow the advice of a clinical psychologist and to take medication for her bipolar
condition constituted sufficient evidence to support termination under section
161.003(a). See In re B.G.S., No. 04-06-00562-CV, 2007 WL 1341401 (Tex.
App.--San Antonio May 9, 2007); see also In the Interest of B.L.M., 114 S.W.3d 641,
645-47 (Tex. App.--Fort Worth 2003, no pet.) (holding evidence was sufficient to
support trial court's finding that father's mental illness rendered him unable to care
for his children until they reached the age of 18 where psychologist testified that
father suffered from paranoid schizophrenia, that schizophrenia was a prolonged
illness, that consistent treatment and medication was essential to stabilize the disease,
and that the unpredictability of the disease put the children at risk, and where father
testified that he would never take medication for his illness in future); Sawyer v. Tex.
Dep't of Protective and Regulatory Services, No. 03-02-00286-CV, 2003 WL
549216, at *8 (Tex. App.--Austin Feb. 27, 2003, no pet.) (holding evidence
supported finding that mother constructively abandoned her children where she failed
to take prescribed medications for her mental health conditions that would enable her
to comply with the responsibilities of parenthood).

 With regard to the present case, the following evidence, viewed in the required
light, supports the findings that (1) that Sally's mental illness rendered her unable to
provide for R.L.'s needs and (2) that her mental illness would continue to render her
unable to provide for R.L.'s needs until his 18th birthday. 

 Sally's sister, Connie Diep, testified that Sally had a mental illness that
rendered her unable to provide for R.L.'s physical, emotional, and mental needs. 
Connie testified that she became Sally's guardian in Arizona in 2002 after Sally had
refused to take her medication and was behaving unstably. Connie had to call the
police on Sally about two or three times in Arizona, including once when Sally, who
had just been released from a Texas hospital, got angry, flew to Arizona where Situ
had taken R.L., and caused a scene. Additionally, Connie confirmed that Sally had
gone off her medication after she came to Texas. Connie told R.L.'s guardian ad
litem, Susan Diedrich, who was appointed in January 2007, that she had concerns
about Sally's being around the Dieps' daughters because "Sally had a history of
violent . . . and inappropriate behavior where she would, for instance, . . . take off all
of her clothes and dance around the house." Connie also told Diedrich that Sally "has
a very high temper when she gets mad and she gets mad very easily."

 Connie's husband, Tony Diep ("Tony"), testified that Sally had a violent
temper and that he had heard people say that Sally was violent with children. Tony
also said that when Sally was not on her medication, she was "in her own world," was
violent, and displayed inappropriate behavior. Tony confirmed that there had been
occasions on which he had seen Sally and he believed that she had not taken her
medication, although he estimated that it was "not very many different times." Tony
told Diedrich that when Sally had worked briefly in his restaurant in Arizona she had
created a disruptive situation and scared customers, so much so that he did not want
her anywhere near his business. 

 Tanya Bassett ("Bassett"), an MHMRA rehabilitation clinician who had Sally
as a patient from September 2005 to May 2007, testified that (1) Sally was referred
to the agency in September of 2005 because of her multiple hospitalizations; (2)
Bassett knew of two or three more hospitalizations since Sally had begun going to
MHMRA; (3) Sally was prescribed medication to keep her "stable"; (4) Sally
admitted to Bassett about 10 times that she had failed to take her medication or
hesitated to take it, despite Bassett's having warned Sally about the consequences of
not taking her medication, and that Sally had refused five or six times to take
medication Bassett placed in her hand; (5) although Bassett had sometimes seen Sally
"highly functional" when Sally was on her medication, she had also seen Sally at a
low functioning level, during which her grooming and hygiene would go down, she
would laugh inappropriately and be preoccupied with voices, and she could not take
care of herself or a young child; (11) (6) when Sally was not taking her medication, she
would hear a female voice telling her negative things; and (7) when Sally was
discharged from MHMRA in May of 2007 because she selected another doctor, her
mental stability was "digressing" and was not "intact" because she was not taking her
medication "as she should." Bassett characterized Sally as severely mentally ill and
opined that the mental illness would continue for the rest of Sally's life; Bassett also
testified that medication is usually a lifetime regimen for someone with Sally's
condition, although the psychiatrist ultimately makes such decisions. Finally, Bassett
testified that Sally disagreed with Bassett "most of the time" when Bassett told Sally
that she had to work on her temper. 

 In December 2006, Sally threatened to shoot Crisha Cotton, a caseworker at
DFPS who was responsible for Sally's case, Melanie Young, R.L.'s foster mother,
and everyone else at DFPS. (12) Cotton testified that, throughout the entire time that she
worked on Sally's case, Sally never exhibited the ability to care for R.L. 

 Diedrich, the child's ad litem, opined that she was "very concerned about
Sally's ability to care for [R.L.]." Diedrich also confirmed that Sally had been
hospitalized between six and eight times over the course of the four years preceding
trial (13) and that the reason for her hospitalizations was noncompliance with
medication. Diedrich concluded, "Sally is noncompliant with her medication and her
history of violence, her history of inappropriate behavior and history of very bad
decision making for herself . . . could be huge for [R.L.]." 

 MHMRA records from 1999 forward supported the above testimony. For
example, the records indicated that Sally was sometimes noncompliant with her
treatment. In fact, one such record revealed that Sally, over her sister's disagreement,
desired to discontinue medication monitoring. An MHMRA report from 2005
indicated that Sally exhibited "agitation," "walk[ed] outside nude with [R.L], and
displayed "aggression towards her mother." A 2006 report noted that Sally heard
voices and had a history of psychotic symptoms. A report produced a few days later
indicated that Sally was "suicidal and feels she wants to harm others if she does not
take her medication" and was "at risk with her child, who is in foster care." Multiple
MHMRA reports from 2006 to 2007 indicated that Sally was noncompliant with her
medication schedule, that she wished to discontinue taking her medication, or that her
compliance was questionable. 

 For her part, Sally denied that failure to take medication had led to her
hospitalizations and that she had ever stopped taking her medication. When asked
why she had been hospitalized, Sally responded, "I don't know." She also expressed
that, if R.L. could live with her, her mental-health problems would be cured. 

 In sum, there was evidence, viewed in the required light, that Sally could not
care for R.L. if she did not take medication, that Sally displayed inappropriate and
dangerous behavior as a result of her mental illness, that she had a long history of
hospitalization for mental illness, and that Sally repeatedly refused to take her
medication. Additionally, Sally's trial testimony, when viewed in the required light,
could reasonably be interpreted as a refusal to acknowledge her noncompliance with
medication and as an inability to appreciate what was required to treat her condition. 
 b. DFPS's reasonable efforts to return R.L. to Sally (Texas
Family Code section 161.003(a)(4))

 Also under issue one, Sally argues that there is legally and factually insufficient
evidence to support the jury's determination that DFPS made reasonable efforts to
return R.L. to Sally. See Tex. Fam. Code Ann. § 161.003(a)(4). We disagree.

 On March 7, 2006, Sally was admitted to Rusk Hospital after being transferred
there under a temporary health commitment stemming from the assault of the grocery
store clerk. At this time, Charles went to visit R.L.'s family with an interpreter. 
Charles explained to Sally's sister and grandmother that it would not be in R.L.'s best
interest to remain in the home because of Sally's behavior. Sally's family disagreed,
stating "[R.L.] would cure [Sally] from her mental illness." Based on this, Charles
testified that she felt the family would not be able to work with DFPS to implement
a plan to minimize the risk of abuse or neglect of R.L. Another CPS worker, Crisha
Cotton, testified that she did not believe either Ling Liu or Situ would be an
appropriate placement for R.L. because they refused to protect R.L. from Sally. 

 Subsequently, at a permanency plan treatment ("PPT") meeting attended by the
Youngs, Situ, and Ling, Situ told Charles that she would allow Sally to live in the
home with R.L. once Sally left the hospital. The grandmother also told Charles she
thought it would be fine for DFPS to place R.L. with Sally, and that Sally's mental
illness would be cured if R.L. was placed with her. Charles testified that she and
Liu's family discussed the agency's goal of having R.L. adopted outside of the family
and that no other family members were offered by Situ or Ling as possible relatives
for placement. An interpreter was provided for Situ during the meeting. 

 On July 27, 2006, Sally signed a family service plan with DFPS. A family
service plan is designed to reunify the parents with their children who have been
removed by DFPS. The service plan required Sally to attend parenting classes, and
to verbalize the techniques she learned to her caseworker. It also required Sally to
participate and complete a psychological evaluation and to follow its
recommendations. Finally, the plan required Sally to attend the court hearings, PPT
meetings, and family visits with R.L. as scheduled. 

 The Fort Worth Court of Appeals has held that DFPS's preparation of several
service plans designed to help a parent regain custody of her child and the parent's
failure to complete the requirements of the service plans constituted "reasonable
efforts" on the State's part to return the child to the mother. In re K.M.B., 91 S.W.3d
18, 25 (Tex. App.--Fort Worth 2002, no pet.); see also In re S.A., No. 2-06-253-CV,
2007 WL 1441014, *12 (Tex. App.--Fort Worth May 17, 2007) (holding that where
DFPS prepared several service plans designed to help mother regain custody of her
child, but she failed to complete them, choosing instead to continue using drugs,
fighting with father, changing residences, and remaining unemployed, DFPS had
made reasonable efforts to reunite child with mother).

 Moreover, the Austin Court of Appeals held that DFPS's attempts to reunite
a child with her parent under 161.003(a)(4) were sufficient where the Department
made efforts to provide the parent with parenting training, assistance with the parent's
mental health needs, and information about community services, but the mother did
not show significant improvement in her ability to care for the child due to her
inability to provide for her own medical needs. Rodriguez v. DFPS, No. 03-05-00321-CV, 2006 WL 1358488 (Tex. App.--Austin 2006, May 19, 2006, no pet).

 In the instant case, DFPS provided Sally with the aforementioned service plan,
a requirement of which was that Sally follow the recommendations of her mental
health service provider. However, Cotton testified that during her time working on
the case, Sally did not complete the family plan of service. Moreover, Bassett
testified that, on numerous occasions, Sally admitted that she had not been compliant
with her medication and that Sally was hospitalized for not having taken medication
six to eight times in four years. Most importantly, Bassett testified that in May 2007,
well after the implementation of the service plan, Sally was not taking her medication
"as she should"and was therefore not "intact." Thus, the jury could have reasonably
formed a firm belief or conviction from this evidence that DFPS had made reasonable
efforts to return R.L. to Sally based on the creation of a family service plan and the
evidence indicating that Sally did not complete this plan and was a danger to R.L.
because of her behavior when she did not medicate. 

 Sally also argues that, in lieu of returning R.L. to her, DFPS should have made
reasonable efforts to unite R.L. with his relatives. However, section 161.003(a)(4)
requires only that DFPS have made reasonable efforts to return R.L. to Sally; it does
not require that DFPS have made reasonable efforts to place R.L. with other family
members, like Situ, Ling, the Dieps or Bau. (14) Nevertheless, we will also examine
whether DFPS undertook reasonable efforts to make such a placement.

 As discussed above, there was sufficient evidence, when viewed in the required
light, that Sally could not adequately care for R.L. when she did not medicate and that
she repeatedly refused to medicate. Nonetheless, there was testimony that Situ or her
other daughters had always been R.L.'s primary caregivers when Sally lived with
them. As previously noted, Charles felt that Situ's statement that "[R.L.] would cure
[Sally] from her mental illness," meant that the family would not be able to ensure
that R.L. would remain free of abuse or neglect. Cotton was similarly concerned
about the family's refusal to protect R.L. from Sally. 

 Testimony revealed that, at the PPT meeting, Situ also told Charles she
thought that it would be fine for DFPS to place R.L. with Sally and restated her belief
that Sally's mental illness would be cured if R.L. were placed with Sally. In fact, Situ
told Charles that Sally could never get better and that her condition would worsen if
she did not live with R.L. Situ also told Charles that Sally would not hurt R.L.
because Sally "loves him so much." Sally's family's expressed goal for R.L. was to
have him returned to his mother. Ling also behaved inappropriately both at the April
2006 PPT and at a subsequent family visit with R.L., yelling and screaming. 

 Cotton did not consider Ling to be an appropriate placement for R.L. because
Ling had stated that she would not keep Sally from R.L. Cotton had the same
concerns about R.L.'s placement with Situ: even after CPS had explained the
situation fully to Situ, Situ continued stating that her daughter "was fine" and that
R.L. "belonged with his mother." Diedrich echoed Cotton's assessment, opining that
Situ would not protect R.L. from Sally because Situ minimized Sally's mental-health
issues. Diedrich concluded that it would be dangerous for whoever had custody of
R.L. to allow him to have contact with Sally because "Sally has a history of violent
behavior when she's not taking her medication" and "[s]he has a history of not taking
her medication." Likewise, Charles opined that a safety plan--which would allow
the child to stay in the home--was not possible for R.L. because of these things. 

 As for the Dieps, Charles testified that it would pose a risk of abuse to R.L. if 
the Dieps were to allow Sally around him, and Connie testified in deposition that she
would allow Sally to visit R.L. if Sally took her medication; she also admitted that she
would allow Bau to visit R.L. even though she thought that it was not in R.L.'s best
interest to allow Bau to see him. Diedrich echoed Charles's concern about placement
with the Dieps because, twice when Diedrich had asked Connie what she would do
if Sally "just showed up at her house" if the Dieps had R.L., Connie said that "she did
not know." Diedrich was concerned that the Dieps would allow Sally to visit with
R.L. if they obtained custody because "it became clear to me that Sally has severe
mental health issues." Diedrich also believed that Connie was minimizing Sally's
mental illness because Connie expressed that Sally's illness "is really not that bad,"
that Sally "just gets angrily easily," and that Sally's poor relationship with her
siblings was not due to Sally's mental illness, but instead existed because Sally "was
jealous that her brothers and sisters were doing better than she was." 

 Bau did not timely complete paternity testing, and DFPS rejected his home-study done by Arizona authorities because Bau himself had translated for his live-in
girlfriend during that visit, and he had represented that that girlfriend would be caring
for R.L. in his home; because Bau failed to provide his tax returns from the last two
years, raising concern over his ability to care for R.L. financially; and because Bau
had visited his son only twice in the child's life. More importantly, Bau told Cotton
that he wanted R.L. back so that he could give R.L. to Sally; likewise, through Ling's
and Situ's comments to Cotton, Cotton came to believe that they wanted R.L. placed
with Bau so that he would return R.L. to Sally. Diedrich confirmed this by testifying
that Connie "gave [her] information about how [Bau] was going to give [R.L.] back
to the family." Diedrich was concerned because, if Bau did so, "the family had
nothing in place to protect [R.L.] from Sally."

 On these facts, we cannot surmise what other steps DPRS could have taken to
reunite Sally and R.L., and there was ample evidence on which the jury could
conclude Sally's other family members were unsuitable placements for R.L. 
Accordingly, we hold that there was legally sufficient evidence to support the jury's
implicit finding under section 161.003(a)(4).

 c. Best interest of R.L. (Texas Family Code section
161.003(a)(5))

 In issue two, Sally contends that there was legally and factually insufficient
evidence that termination of her parental rights was in R.L.'s best interest. 

 In determining whether termination of Sally's parental rights was in R.L.'s best
interest, we may consider several factors, including (1) the child's desires, (2) the
current and future physical and emotional needs of the child, (3) the current and
future physical danger to the child, (4) the parental abilities of the persons seeking
custody, (5) whether programs are available to assist the persons seeking custody in
promoting the best interests of the child, (6) plans for the child by the persons seeking
custody, (7) the stability of the home, (8) acts or omissions of the parent that may
indicate that the parent-child relationship is not proper, and (9) any excuse for acts
or omissions of the parent. Adams v. Tex. Dep't of Family & Protective Servs., 236
S.W.3d 271, 280 (Tex. App.--Houston [1st Dist.] 2007, no pet.) (citing Holley v.
Adams, 544 S.W.2d 367, 371-72 (Tex. 1976)). Not all of these factors need be
decided against the parent in order to find that termination is in the child's best
interest. See Salas at 791.

 1. The current and future physical and emotional needs of the child

 Connie testified that it was not good for R.L. for Sally to go in and out of
psychiatric hospitals. Diedrich concurred, opining that Sally's inconsistencies in
medicating herself and her hospitalizations would disrupt R.L.'s permanency,
stability, and sense of security, all of which were "very important to a child,
particularly to a young child such as [R.L.]." Bassett observed that R.L. did not
readily come to Sally at DFPS visits and that it was hard for Sally to interact with her
child because R.L was young and established with the Youngs, his foster family. 
Cotton, who supervised visits between R.L. and his family, said that, on some visits,
R.L. had no problems interacting with Sally, but other times, he preferred the Youngs. 
She testified that when R.L. would become upset at visits, only the Youngs could
calm him. Diedrich observed that R.L. did not appear to bond with Sally at visits. 

 2. The current and future physical danger to the child

 Cotton testified that, on one visit, Sally became so frustrated with R.L. that she
said that she never wanted to see him again; it was at this visit that Sally threatened
to shoot Cotton, Mrs. Young, and everyone else at DFPS. Furthermore, the MHMRA
records revealed that Sally exhibited "agitation," "aggression," and had a history of
psychotic symptoms. Most importantly, the records reveal Sally was suicidal, "feels
she wants to harm others if she does not take her medication," and was "at risk" with
R.L. 

 3. The stability of the home or proposed placement

 Bassett felt that Sally did not have a support group because she was not close
to Ling, Ling's husband did not like Sally, her mother had gone back to Arizona,
Sally's current husband was often out of town, and her family was not "really
supportive of her." Moreover, there was much testimony that neither Bau, Situ, or
Ling, would protect R.L. from Sally. 

 With regard to R.L.'s home with the Youngs, Diedrich described it as "lovely,"
"kid-oriented," and as a safe and loving environment. Dietrich stated that R.L.
considers Melanie Young to be his mother and that R.L.'s relationship with Roy
Young is "loving" and "bonded." R.L. calls Melanie "mommy" and Roy "daddy." 
Melanie Young testified that R.L. is bonded to her and that she loves him and wants
to adopt him.

 4. The acts or omissions of the parent that may indicate that the parent-child relationship is not proper


 During a few visits with R.L., Sally was disruptive, yelling and screaming at
the supervisor or foster parents that "it was unfair, her son belonged to her, that she
needed her son." Moreover, as previously detailed, Sally has displayed other
inappropriate and violent behaviors and numerous witnesses testified that Sally is not
capable of caring for R.L. Finally, numerous MHMRA records indicate that Sally
often displays "very poor judgment" which could "compromise her safety." An
MHMRA "progress note" reflects that Sally married her husband so that he could
obtain a green card and that Sally wanted to have a baby immediately, despite her
doctor's advice that she needed to remain on her medication. 

 Connie testified that it would be in R.L.'s best interest for Sally's parental
rights to be terminated. After having "examined the records and Sally's mental health
issues, her hospitalizations, her violent history, her noncompliant [sic] with her meds
historically," Diedrich also concluded that it would be in R.L.'s best interest for
Sally's parental rights to be terminated and for him to be placed with the Youngs
because R.L. would be at risk if he were placed with Sally. 

 5. Summary

 Viewing the evidence in the light most favorable to the verdict, we hold that
the jury reasonably could have formed a firm belief that termination of Sally's
parental rights was in the best interest of R.L.

 2. Factual Sufficiency

 a. Sally's ability to care for R.L. through his eighteenth birthday
(Texas Family Code section 161.003(a)(1)-(2))

 Under part of issue one, to support her factual-sufficiency challenge to these
elements, Sally argues that (1) the medical records show that Sally is not a danger to 
R.L., and there was no other evidence that Sally "abused, neglected, mistreated, hit,
spanked, scratched, dropped or engaged in violent behavior toward R.L."; (2) two
separate November 1995 MHMRA medication maintenance reports indicated that
Sally was "stable on meds," well-groomed, cooperative, and exhibiting normal
behavior; (3) "[a]t the worst, Sally has had a few lapses with respect to taking her
medication," as indicated by her medical records, which Sally argues "reveal that
medication management and symptom management are ongoing goals" for her and
that she "succeeds in achieving" those goals "90% of the time"; (15) (4) Bassett testified
that Sally was noncompliant with her medication only "a couple of times"; (5) Sally's
doctor after MHMRA, Dr. Mike Yuan, wrote a letter stating that Sally had been stable
under his care for 12 months, from January 2006 to January 2007; (6) "there was no
evidence about the possible duration of Sally['s] . . . mental illness"; and (7) the only
evidence of Sally's violent temper was the one incident of her having slapped a store
clerk.

 As for argument (1), the legal standard is not whether Sally was a danger to or
injured R.L., but whether she was "unable to provide for the physical, emotional, and
mental needs" of R.L. Regardless, the jury could have chosen to believe the
testimony of Diedrich, who concluded that it would be dangerous for whoever had
custody of R.L. to allow him to have contact with Sally because "Sally has a history
of violent behavior when she's not taking her medication" and "[s]he has a history of
not taking her medication."

 As for argument (2), although some of Sally's MHMRA medical records from
office visits indicated that she was compliant with medication, stable, and functioning
adequately for those visits, other records (set out under our legal-sufficiency
discussion) indicated that she was noncompliant with medication, was unstable, was
suicidal, exhibited functional impairment, or showed anger or stress at those visits. 
The jury reasonably could have considered the record entries showing non-compliance with medication and suicidal, angry, or unstable behavior in reaching its
implied finding on Sally's ability to care for R.L.'s needs. 

 Concerning arguments (3) and (4), there was disputed evidence as to whether
Sally had repeatedly failed to take her medications. Sally denied ever having missed
her medication, and, during some of the MHMRA visits, she behaved appropriately
and indicated that she was compliant with medications. Nonetheless, Bassett said that
Sally told her about 10 times of Sally's noncompliance with medication, Bassett
recounted times that Sally appeared not to be functioning well, and Sally was
hospitalized for not having taken medication six to eight times in four years. Again,
the jury could reasonably have believed the evidence indicating that Sally had failed
repeatedly to take her medications regularly.

 As for argument (5), the jury was entitled to believe the testimony of Bassett,
who opined that Sally had not been stable for the entirety of the year in which Dr.
Yuan had stated that she had been, as well as the evidence that Sally had been
hospitalized during that 12-month period. The jury was also entitled to discount Dr.
Yuan's letter because Sally had left MHMRA in order to find a doctor who, as Bassett
testified that Sally had said, "would help her get her baby back," specifically, who
"could stretch the truth a little bit" and "would bend the truth and say that she could
get [the] baby back and get the baby back for her." 

 Although Sally contends, in argument (6), that there was no evidence of the
possible duration of her illness, Bassett opined that Sally's mental illness would
continue for the rest of Sally's life. 

 Finally, contrary to Sally's contention in argument (7) that the only evidence
of Sally's violent behavior was the one incident in which she slapped a clerk, Tony,
Bassett, Diedrich, and even Connie (through others' testimony) described Sally as
having exhibited a violent temper or behavior, and Sally threatened to kill herself and
to shoot Cotton, Mrs. Young, and the CPS staff.

 In sum, we hold that a reasonable factfinder could have resolved the conflict
in any disputed evidence on which Sally relies in favor of its implied finding that
Sally would be unable to provide for the physical, emotional, and mental needs of
R.L., in all reasonable probability, until his eighteenth birthday. See In re J.F.C., 96
S.W.3d at 266. That is, we hold that the evidence set out in our previous discussion
of legal sufficiency is reasonably sufficient to form in the factfinder's mind a firm
belief or conviction of the truth of this implied finding. See In re C.H., 89 S.W.3d at
25. 

 b. DFPS's reasonable efforts to return R.L. to Sally (Texas
Family Code section 161.003(a)(4))


 Under part of issue one, to support her factual-sufficiency challenge to this
element, Sally argues only:

 The evidence speaks . . . to [DFPS's] intent never to return R.L. to Sally
. . . and to [DFPS's] prejudices directed at confused Chinese immigrants
and those suffering from mental illness. [Cotton] testified that [DFPS]
did not want to place R.L. with the Dieps because [DFPS] believed that
there was a conspiracy among family members to return R.L. to Sally
. . . . [Cotton] could not articulate a reason why [DFPS] took R.L. and
what was the basis for removing him from Situ and Ling . . . . Cotton
then agreed there was no emergency to remove R.L. from his home.


The first assertion is not supported by record references. The second sentence,
concerning the Dieps and the family conspiracy that Cotton perceived, was only one
reason given by witnesses as to why the Dieps were not an appropriate placement for
R.L.; the other reasons having been set out above. Also, as previously noted, whether
the Dieps were a suitable placement alternative is not an issue before this Court. The
last two sentences concern only the bases for DFPS's initial removal of R.L. on an
emergency basis, rather than the statutory criteria of whether DFPS made reasonable
efforts to return R.L. to Sally thereafter. Nonetheless, after having reviewed the
entire record, we hold that a reasonable factfinder could have resolved the conflict in
any disputed evidence on which Sally relies in favor of its implied finding that DFPS
made reasonable efforts to return R.L. to her. See In re J.F.C., 96 S.W.3d at 266. 
That is, we hold that the evidence set out in our previous discussion of legal
sufficiency is sufficient reasonably to form in the factfinder's mind a firm belief or
conviction of the truth of this implied finding. See In re C.H., 89 S.W.3d at 25. 


 c. Best interest of R.L. (Texas Family Code section
161.003(a)(5))


 To support her factual-sufficiency challenge to this element, Sally contends
that the evidence supporting termination of her parental rights is "less than paltry"
and that there was "absolutely no evidence that [Sally] might be a danger to R.L." 
Moreover, Sally asserts there was "no evidence" that she could not parent R.L. and
would not be able to in the future. 

 These assertions do not so outweigh the evidence supporting the jury's finding 
that termination of Sally's parental rights is in the best interest of R.L. In reviewing
the decision for factual sufficiency, we have considered ample evidence that the
parent-child relationship was not a proper one. The acts on the part of Sally which
warrant this conclusion, as set forth in our previous discussion of legal sufficiency,
are: 1) her history of violence; 2) her threats of suicide; 3) her lack of sensitivity to
the needs of R.L. as evidenced by her inappropriate behavior around R.L.; and 4) her
inability, now and in the future, to care for R.L. because of her repeated failure to take
her prescribed medication. Thus, we hold that the jury's determination of R.L.'s best
interest is supported by clear and convincing proof that is factually sufficient.

E. Sufficiency of the Evidence Supporting Termination Under Section
161.001(1)(O), 161.001(2) (Failure to Comply with Provisions of Court
Order, Best Interest of Child)


 Although we have held that termination in this case is supported under section
161.003 of the Family Code, we also hold that termination is supported under
subsection (O) of section 161.001(1) and section 161.001(2).

 Pursuant to section 161.001(1)(O) of the Texas Family Code, the court may
order termination of the parent-child relationship if the court finds by clear and
convincing evidence that the parent has "failed to comply with the provisions of a
court order that specifically established the actions necessary for the parent to obtain
the return of the child who has been in the permanent or temporary managing
conservatorship of the Department of Family and Protective Services for not less than
nine months as a result of the child's removal from the parent under Chapter 262 for
the abuse or neglect of the child." Tex. Fam. Code Ann. § 161.001(O) (Vernon
Supp. 2008). Under section 161.001(2), termination must also be in the child's best
interest. In re J.F.C., 96 S.W.3d at 263.

 The provisions governing service plans are located in Chapter 263 of the
Family Code. That chapter provides that "not later than the 45th day after the date
the court renders a temporary order appointing the department as temporary managing
conservator of a child under Chapter 262, the department . . . shall file a service plan." 
Tex. Fam. Code Ann. § 263.101 (Vernon 2002).

 Among other requirements, the service plan must (1) be specific and (2) be in
writing in a language that the parents understand, or made otherwise available. Tex.
Fam. Code § 263.102(a)(1)(2) (Vernon 2002). The court may render appropriate
orders to implement or require compliance with an original or amended service plan. 
Tex. Fam. Code Ann. § 263.106 (Vernon 2002). 

 In the instant case, it is undisputed that R.L. was removed under Chapter 262
of the Family Code and was in DFPS's custody for more than nine months. However,
Sally claims there is insufficient evidence that she failed to comply with a court order
specifying the actions she had to take for DFPS to return R.L. to her. We disagree.

 The July 27, 2006 service plan signed by Sally required her to attend parenting
classes, and verbalize the techniques she learned to her caseworker. It also required
Sally to participate and complete a psychological evaluation and to follow its
recommendations, which in this case included "attend[ing], participat[ing], and
successfully complet[ing] the services." Finally, the plan required Sally to attend the
court hearings, PPT meetings, and family visits with R.L. as scheduled. Sally has not
alleged that she did not understand the terms of her service plan.

 On March 23, 2006, the trial court signed the parties' "Agreed Temporary
Order Following Adversary Hearing" which required Sally, pursuant to section
263.106 of the Texas Family Code, "to comply with each requirement set out in the
Department's original, or any amended, service plan during the pendency of this
suit." 

 Although there is some evidence in the record that Sally completed some
parenting classes, went to MHMRA, and secured housing, as previously noted, 
numerous MHMRA records made a part of this appeal reflect Sally's noncompliance
with her medication since the court's order was signed on March 23, 2006. 
Specifically, on September 22, 2006, the MHMRA records indicate that Sally's full
compliance was "questionable" and that she had difficulty accepting her mental
illness. A notation on October 6, 2006, indicates that her compliance was "partial"
and that Sally was exhibiting "psychotic symptoms." Again, on October 23, 2006,
the records indicate Sally's compliance with her medication was "partial" and that
Sally "admitted auditory hallucinations when off meds [sic]." On November 21,
2006, records indicate partial compliance and that Sally was experiencing auditory
hallucinations when she was off her medication. Finally, on January 31, 2007, the 
MHMRA records indicate that Sally was, at that time, stable on her medication but
that her "history of noncompliance/partial compliance has affected management and
patient remains at risk." On May 11, 2007, Sally discontinued her care with
MHMRA.

 Again, the jury could reasonably have considered the record entries showing
noncompliance with medication in reaching its finding that Sally failed to comply
with the court's order establishing the actions necessary for the return of R.L. 
Furthermore, the jury was entitled to believe the testimony of Bassett regarding
Sally's noncompliance with medication and Cotton's testimony with regard to Sally's
failure to complete the family plan of service. 

 In light of these facts, we hold that Sally's failure to successfully complete the
terms of her service plan, constitutes a material violation of the court's order
sufficient to support a finding for termination under subsection (O). See In re J.F.C.,
at 277-78 (holding that, among other omissions, failure to complete all scheduled
counseling sessions with therapist ordered by court to avoid termination of parental
rights constituted a material violation of the court's order sufficient to support a
finding of termination under subsection (O)). 

 Consequently, the evidence, viewed in the light most favorable to the section
161.001(1)(O) finding, was sufficiently clear and convincing that a reasonable
factfinder could have formed a firm belief or conviction that Sally failed to comply
with the provisions of a court order that specifically established the actions necessary
for her to obtain the return of R.L. We further conclude that, viewed in the light of
the entire record, any disputed evidence could have been reconciled in favor of the
section 161.001(1)(O) finding or was not so significant that the factfinder could not
reasonably have formed a firm belief or conviction that Sally failed to comply with
the provisions of a court order that specifically established the actions necessary for
her to obtain the return of R.L. 

 With regard to the second prong of section 161.001, that termination is in the
best interest of the child, we hold that the evidence set out in our previous discussion
of best interest is reasonably sufficient to form in the factfinder's find a firm belief
or conviction that termination of Sally's parental rights is in the best interest of R.L.
for the purposes of section 161.001(2). (16) Accordingly, we hold that the evidence was
legally and factually sufficient to support the section 161.001(O) finding.


 Conclusion


 Based on the foregoing reasons, the trial court's judgment is affirmed.

 


 Davie L. Wilson

 Justice


Panel consists of Justices Keyes, Higley, and Wilson. (17)



 
1. See Tex. Fam. Code Ann. § 263.405(a) (Vernon Supp. 2008).
2. Upon the jury's verdict, the trial court also terminated the parental rights of R.L.'s
father, William Bau. Bau signed an affidavit for voluntary relinquishment of his
parental rights on July 3, 2007.
3. Id. § 161.001(1)(D) (Vernon Supp. 2008).
4. Id. § 161.001(1)(E) (Vernon Supp. 2008).
5. Id. § 161.003(a)(1)-(5) (Vernon 2002).
6. Id. §§ 161.001(2), 161.003(a)(5) (Vernon 2002 & Supp. 2008).
7. On August 10, 2007, Connie requested that the Arizona court terminate her
guardianship over Liu.
8. At some point, and for some period of time, Sally lived with a man whom she married
in Texas. Shortly before trial, Sally lived in a group home following release from a
hospital stay.
9. Also, and more importantly, Situ, Bau, and Ling did not intervene seeking
conservatorship of R.L. Connie and her husband, Tony Diep ("Tony"), did intervene
seeking termination of Sally's parental rights and adoption of R.L., and were an
alternative for the jury to choose, but have filed a motion with the trial court to
dismiss their appeal of the order terminating Sally's parental rights and appointing the
Young's as R.L.'s conservators. 
10. We interpret Sally to challenge both the legal and factual sufficiency of the evidence,
despite the fact that her prayer for issue one requests a rendition of judgment and that
her argument does not distinguish between the two challenges, because (1) her issue
one is phrased in terms of both types of sufficiency challenges and (2) she discusses
evidence both that supports and that undermines the jury's verdict.
11. Despite Bassett's testimony as to how Sally differed when on and off her medication,
when Sally was asked whether she saw "any differences in your behavior, in your
ability to function when you take the medication and [when] you don't take the
medication," Sally responded, "The same." 
12. Sally herself admitted to leaving a voice message for the foster parents, the Youngs,
within six months of trial, that she was going to kill herself. 
13. According to Sally's testimony, she had been hospitalized two to three times in Texas
and four or five times in Arizona over the past four years preceding trial. In fact, one
or two weeks before trial, Sally had been released from the hospital again.
14. In support of her argument that none of R.L.'s relatives was fairly considered for
placement, Sally cites Horavtich v. TDPRS. 78 S.W.3d 594 (Tex. App.--Austin
2002). In Horavtich, the Austin Court of Appeals held that the record contained
factually insufficient evidence that termination of Horavtich's parental rights was in
the best interest of her children under section 161.001 of the Texas Family Code. 
Horavtich, 78 S.W.3d at 595. Horavtich is inapplicable to the instant case because
it does not address DFPS' reasonable efforts to return a child under Tex. Fam. Code
§ 161.003(a)(4). 
15. Sally does not cite to the record for support for the 90% statistic.
16. See discussion supra at (D)(1)(c).
17. The Honorable Davie L. Wilson, retired Justice, First Court of Appeals, participating
by assignment.