# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-14-00597-CV

C. S. F., Appellant

v.

Texas Department of Family and Protective Services, Appellee

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. D-1-FM-13-002917, HONORABLE TIM SULAK, JUDGE PRESIDING

## MEMORANDUM OPINION

In early September 2014, a jury determined appellant C.S.F.'s parental rights should be terminated under section 161.003 of the family code, which provides that a parent's rights may be terminated if it is shown that: (1) the parent has a mental or emotional illness[1] that renders the parent unable to properly care for her child's needs; (2) the illness will, in all reasonable probability, continue to render the parent unable to care for her child's needs until the child's eighteenth birthday; (3) the Department has been the child's managing conservator for at least six months prior to the termination hearing; (4) the Department has made reasonable efforts to reunite the parent and child; and (5) termination is in the child's best interest.[2] Tex. Fam. Code § 161.003(a). In three issues,

---

[1] Section 161.003(a) also allows for termination if the parent has mental deficiencies that render her unable to care for her child, Tex. Fam. Code § 161.003(a), but there are no allegations that C.S.F. suffers from a mental deficiency.

[2] N.E.'s father's rights were also terminated, but he has not appealed from that decision.

C.S.F. attacks the legal and factual sufficiency of the evidence supporting the jury's verdict. She contends the evidence is insufficient to support findings: (1) that she suffers from a mental illness that renders her unable to care for N.E. and that any such illness will likely persist until N.E. is eighteen years old, (2) that the Department made reasonable efforts to reunite her with N.E., or (3) that termination is in N.E.'s best interest. We affirm the trial court's decree of termination.

**Factual and Procedural Background**

According to the Department's pleadings and supporting affidavits, in mid-April 2013, N.E., who was at the time thirteen years old, was hospitalized for six days due to suicidal ideation. On April 24, the Texas Department of Family and Protective Services received a report of medical neglect alleging that C.S.F. was refusing to seek medical care for N.E.'s mental health issues. Marcy Hannum, a Department caseworker, met with N.E., who reported having suicidal thoughts "due to her mother's instability" but said she did not actually want to commit suicide. N.E. also expressed concern that C.S.F. might not help with N.E.'s mental health issues. N.E.'s school counselor told Hannum that she had concerns about C.S.F.'s mental health and that C.S.F. was uncooperative and reacted inappropriately when approached about N.E.'s mental health concerns. Finally, Hannum spoke to C.S.F., who insisted that N.E. "was being 'put up' to this behavior" and was "acting this way due to her father saying horrible things about her." Hannum said C.S.F. "did not make sense" during the interview and frequently changed the subject.

On May 9, the Department received another report that N.E. was suicidal when she was around C.S.F. Hannum again met with N.E., who said that C.S.F. was unstable and that N.E. "did not feel safe at home" and "was going to hurt herself" if she was returned to her mother's care.

2

Hannum requested an emergency mental health assessment, which determined it would not be safe to return N.E. to C.S.F.'s care. N.E. was again hospitalized for approximately one week for treatment of depression and suicidal thoughts. During that time, hospital staff members reported that C.S.F. was agitated, disorganized, repetitive, "tangential with her speech," seemingly paranoid, and possibly delusional. Staff members also expressed concern that C.S.F. did not want N.E. to be treated and would not provide adequate care or treatment upon N.E.'s release. N.E. was released into the care of Lara Burnett, C.S.F.'s acquaintance from church, rather than to C.S.F.'s care.

In late May, the Department sought and was granted conservatorship of N.E., and N.E. was soon moved from Burnett's care to the home of Denise and Richard Ketcham, another family C.S.F. knew from church. Among other things, C.S.F. was ordered to complete a psychological evaluation and follow all recommendations, participate in individual therapy, and take a protective parenting class. C.S.F. was ordered not to contact N.E. other than in their supervised visitations, to only contact the Ketchams via email, to stay away from the Ketchams' house and N.E.'s school, and not to contact the attorneys or other professionals involved in the case. N.E. stayed with the Ketchams until she was again hospitalized for several days in late October 2013. In November 2013, soon after her release from the hospital, N.E. was moved to Settlement Home, a residential treatment center, where she was still living at the time of trial.

**Summary of the Testimony at Trial**

The following witnesses testified about N.E.'s mental health issues, treatment, and progress: Dr. Asif Siddiqui, N.E.'s psychiatrist from April through October 2013; Dr. Jessica Tsourmas, a child psychiatrist who worked with N.E. while she was hospitalized in April and May

3

2013; Musarat Yusufali, a hospital social worker who worked with N.E. in April 2013; Lacey Evans, N.E.'s supervising therapist at Settlement Home for the first eight months of her stay; Amy Blake, N.E.'s CASA volunteer; Denise Ketcham; Carmen Bolich, the family's caseworker; and N.E. herself. Their testimony is summarized as follows:

- N.E. was hospitalized due to suicidal thoughts three times between April and November 2013. After numerous attempts to stabilize her moods and thoughts through medication and changed dosages, Dr. Siddiqui recommended she be placed in a residential treatment center.

- N.E. was first hospitalized due to depressive symptoms and suicidal thoughts; her primary stressors were being bullied at school and C.S.F.'s "mental illness." N.E. told Dr. Siddiqui that she had had hallucinations since she was seven years old, sometimes heard voices that told her to kill herself, and suffered from mood swings, depression, sleep disruptions, anger, the desire to cut herself, and suicidal thoughts. N.E. said she was depressed when she was with C.S.F. and did not want to live with her, but C.S.F. denied any role in N.E.'s problems and told Dr. Siddiqui that they were the result of N.E.'s being bullied and manipulated at school. Dr. Siddiqui said that if N.E. was inventing symptoms to avoid living with C.S.F., that would still indicate a serious problem. N.E. was diagnosed with "major depressive disorder with psychotic features" and "may have underlying bipolar symptoms."

- N.E. was readmitted in May 2013 due to "stress at home with her mother" and "the mental state of her mom." When N.E. was to be released the second time, she was "pretty adamant" that she did not want to return to C.S.F.'s care, said she felt unsafe returning to C.S.F.'s home, and seemed relieved when she learned she would be going to stay with Burnett.

- Following her third hospitalization in October 2013, N.E. was admitted to Settlement Home due to depression, suicidal ideation, and self-harming behaviors or ideation. N.E. was still at Settlement Home at the time of trial, during which time Evans said her behavior and ability to handle her emotions has improved. N.E. has become more stable and better able to accept feedback and talk things through and can be redirected. N.E. loves C.S.F. but does not feel understood or heard by her and does not feel that C.S.F. can keep her safe. Despite her progress, N.E.'s diagnoses will not disappear, and she will need therapy for a long time.

- N.E. was often anxious before and after her unsupervised visits with C.S.F. at Settlement Home. Those visits were stopped by Settlement Home in the Spring of 2014, after C.S.F. learned that N.E. had been communicating with Rebecca Burtt, N.E.'s sister and C.S.F.'s older daughter, and yelled at N.E., said negative things about Burtt, and refused to listen to N.E. N.E. returned from that visit sobbing and required "a lot of attention throughout the night to manage." C.S.F. also began sending the professionals involved in the case numerous

4

emails and phone calls that "were long, repetitive, and extremely inappropriate," including calling Burtt a "demented human being."

- Asked why N.E. has depressive disorder and borderline personality traits, Evans said, "I don't think that I can say why she has certain diagnoses. What I can say is that her—the behaviors that we see and the way that she perceives the world and her difficulty in regulating can—can be at least partially contributed to her development and her exposure to having her primary caregiver being very impulsive and being exposed to situations where she didn't have adequate supervision and structure and she wasn't taught how to calm and self-soothe. . . . [N.E.] didn't have that. And so when she is separate from adults, she can't regulate herself and she doesn't feel—didn't feel safe enough to come back to adults to get that regulation. So we had to teach her that as a teenager. And that's hard for a teenager to learn, right, because she's got all this other normal teenager stuff going on. So helping her through all of that was a big part of her treatment."

- Evans testified that N.E. needs "an extremely healthy parent who is high enough functioning and attentive to be able to help [N.E.] navigate life with the supports in place so that she can be both emotionally regulated enough to make sound decisions and be supported and held accountable to be able to function and be healthy as a young adult." If N.E. continues to be in a structured and nurturing environment and to make good progress, she "is totally capable of being a healthy, thriving successful young adult." Evans also said that because of C.S.F.'s "dysregulated behaviors," C.S.F. was unable to meet N.E.'s needs and "could cause a huge regression" for N.E.

- Blake testified that N.E. has grown more mature and can be redirected in a more positive direction if she is in a bad mood. Blake did not believe N.E. should be returned to C.S.F.'s care because Blake did not believe that N.E. would get the care and support she needs or that C.S.F. could be empathetic, understanding, or nurturing. N.E. has spoken to Blake about getting emancipated when she turns sixteen in the event that C.S.F.'s rights were not terminated, but shortly before trial, N.E. told Blake she wanted to return home, explaining that she wanted to be with her friends again.

- Early in N.E.'s time with the Ketcham family, N.E. said she was "scared of her mother's temper." After N.E. had supervised visits with C.S.F., N.E. was usually "very agitated and emotional" and would be "too emotionally overwrought or worn out from the visits." Ketcham said that N.E. has made good progress at Settlement Home as far as seeming more emotionally stable. Ketcham also testified that C.S.F. seemed "erratic" and that Ketcham had concerns about C.S.F.'s mental health.

- Bolich said that the Department intended to seek an adoptive home for N.E., and several witnesses testified that N.E. was adoptable despite her age. They also testified that Settlement Home has a foster-to-adopt program that allows children to "road-test potential placements."

5

Asked whether C.S.F. and N.E. would be allowed to have continued communication if C.S.F.'s rights were terminated, Bolich answered, "[I]f rights were terminated and she is adopted by a family, it would depend on the family. If they are willing to continue to have contact with [C.S.F.], then that would be allowed. . . . I believe with [C.S.F.]'s previous behavior with the placements, that is why we are wanting to terminate, so the placement can have that decision to say, all right, the visits have gotten out of hand or, you know, it's inappropriate so we need to cut them off."

- N.E. testified that she loved her mother and wished C.S.F. had gotten help for her own mental health problems. She said that if her mother had engaged in therapy or seen a psychiatrist, including taking any prescribed medications, she would want to live with C.S.F. However, she did not believe that she could be healthy living with her mother if C.S.F. did not see to her own mental health. She had seen some improvement in C.S.F.'s behavior, saying that "occasionally it will fall back, so it's like two steps forward, one step back." N.E. said Blake, her caseworker, and her attorney had told her that she could see C.S.F. even if her rights were terminated, and later clarified that she had been told that such visits would be subject to permission by her managing conservator.

In addition to the preceding witnesses, who primarily testified about N.E.'s problems and needs but also provided some information about C.S.F.'s behavior and apparent mental health, the following experts testified about their work with and observations of C.S.F.: Dr. Kelly Ahr, a psychologist who performed a psychological evaluation of C.S.F. in February 2007; Marissa Engel, a social worker who worked with C.S.F. from July 2013 until early October 2013; Dr. Jessica Thompson, a psychiatrist who evaluated C.S.F. in October 2013; Tammi Schrager, a therapist who saw C.S.F. four times in October 2013; Dr. Dale Hsieh, a psychiatrist who conducted a psychiatric exam of C.S.F. in November 2013; Amanda Ramirez, a counselor who provided family therapy for C.S.F. and N.E. from January 2014 through May 2014; Dr. Ericka Brothers, a psychologist who performed C.S.F.'s psychological evaluation in May 2014; Celina McAlister, a counselor who had eleven sessions with C.S.F. from early November 2013 until February 2014; and Edward Saddy, a counselor who started working with C.S.F. in June 2014. The Department also introduced a

6

psychological evaluation done by Dr. Andrea Spraggins in July 2013. The lengthy and detailed testimony of those experts, as well as the relevant testimony of the witnesses previously discussed, is summarized and greatly condensed for brevity's sake[3] as follows:

- Throughout this proceeding, C.S.F. frequently grew dissatisfied with her therapists, counselors, and doctors, filing complaints against their licensing authorities and threatening to sue or actually filing suit.[4] She has difficulty keeping appropriate boundaries and sometimes resorted to using inappropriate language, emailing or calling too often, and being impatient in general. She told more than one professional that she hoped they would "rot in hell" for their actions in the case, and she prefaced one evaluation by saying that "anyone who says anything wrong about me is going to be sued."

- While N.E. was in the hospital, C.S.F. was sent home more than once because of her behavior and because N.E. refused to see her. Family therapy sessions and visitations were repeatedly ended early, and eventually terminated, because of C.S.F.'s refusal or inability to stop disparaging people involved in the case or discussing inappropriate topics.

- Most of the experts testified that C.S.F. displayed a lack of empathy, explaining that she had trouble recognizing other people's emotions and understanding why they might feel happy or sad. She was also described as potentially manipulative in her interpersonal relationships. In her evaluations and therapy sessions, C.S.F. consistently denied that she had any failings, denied having any mental health problems of her own, minimized or utterly denied any role in N.E.'s mental health issues, and blamed other people for N.E.'s problems. C.S.F. frequently denied any unhappiness or dissatisfaction with her life, despite N.E. having been hospitalized due to suicidal ideation and other mental problems and removed from her care.

- Although C.S.F. brought N.E. for follow-up care and obtained N.E.'s prescribed medications after her release from the hospital in April, she also downplayed N.E.'s problems or even denied that N.E. had mental issues. C.S.F. was described as seeming not to understand what she was told about N.E.'s condition and needs, and many of the experts were concerned that C.S.F. would not recognize if N.E. was in distress and would be unwilling to get her the help she needed.

_____

[3] *See* Tex. R. App. P. 47.1 (appellate court's opinion should be "as brief as practicable").

[4] Dr. Siddiqui testified that he repeatedly refused C.S.F.'s requests to evaluate her or provide her with a diagnosis, explaining that it was a conflict of interest because he was treating N.E. He also had to tell C.S.F. to stop telling people that he was her doctor, and in response, C.S.F. grew angry and threatened to sue and file a complaint with the medical board.

7

- Multiple doctors, social workers, and therapists noted that C.S.F. spoke rapidly and was tangential in her speech. She was described as defensive, repetitive, and disorganized in her thinking. Multiple witnesses saw signs of paranoid delusions, including allegations about a "mafia/drug cartel" involving N.E.'s father. C.S.F. was described by two doctors of "perserverating," meaning she would get "hyperfocused" on certain topics, such as all of the things she had done for N.E., and could not be redirected. Several experts testified that they believed C.S.F. was not truthful in her answers and that they therefore could not give definitive diagnoses.

- In 2007, Dr. Ahr made a provisional diagnosis of bipolar disorder. In 2013, Dr. Spraggins made a provisional diagnosis of "Schizoaffective Disorder, Bipolar Type" and also said, "Rule Out Personality Disorder NOS (Borderline and Histrionic Traits)."[5] Also in 2013, Engel diagnosed her with "schizoaffective disorder, bipolar type." In 2014, Dr. Brothers arrived at diagnoses of "Schizoaffective Disorder, bipolar type (provisional)" and possible "Adjustment Disorder with anxiety," "Narcissistic Personality Disorder with Histrionic and Obsessive-Compulsive features," and "Unspecified Neurocognitive Disorder."[6]

- Dr. Spraggins recommended further therapy and psychiatric consultation, noting that C.S.F. might "show resistance to receiving services, as she show[s] a significant lack of insight into her mental health functioning and denies any mental health difficulties." Likewise, Dr. Brothers said that psychological and psychiatric treatment with medication was "pretty imperative" for treatment of schizoaffective disorder, bipolar type but that it was "very

---

[5] The doctors explained that a "provisional diagnosis" means the doctor needs more information and/or time to work with the patient before making a more definitive diagnosis. Several of the experts in this case stated that their short time to interview C.S.F., coupled with her refusal to give truthful answers, defensiveness, and tangential thought process, made it impossible to do more than give a provisional diagnosis. "Rule out" in a diagnosis means that the doctor sees indications of that disorder that require further exploration. Dr. Brothers summarized, "I think it's clear that we're dealing with some type of mental health issue here. Just defining which one is the bigger chore."

[6] Drs. Thompson and Hsieh were unable to reach definitive diagnoses based on C.S.F.'s interviews. Thompson diagnosed her with "adjustment disorder," meaning she seemed to be having "some difficulty going through a stressful situation, having some difficulty adjusting to it." Hsieh reached "very tentative" diagnoses of "mood disorder NOS," meaning "there's something going on, she's not feeling well, doesn't fit into a category very clearly," and "personality disorder NOS," meaning "[s]he didn't fit a criteria again of a very specific personality diagnosis, but . . . there could be elements of different diagnoses in there." ("NOS is an abbreviation for Not Otherwise Specified, indicating a cluster of symptoms that do not clearly fit in any single diagnostic category. NOS is often a provisional diagnosis pending additional information or testing." Wikipedia, DSM-IV codes, http://en.wikipedia.org/w/index.php?title=DSM-IV_codes&oldid=642531696 (as of Feb. 19, 2015).)

common" for someone with such an illness to deny having any mental illness, which makes "[t]reatment compliance" much more difficult. Engel concluded that further counseling was contraindicated, explaining, "Due to her lack of understanding of her own mental illness and due to her lack of willingness to address it, counseling actually seemed to inflame the issue and create more problems for her than it solved." Engel said that schizoaffective disorder, bipolar type was difficult to treat, particularly if the person did not recognize or admit to having the illness and refused to take medication.

- Dr. Siddiqui believed C.S.F. was in need of psychiatric assistance and testified that living with C.S.F. had adversely affected N.E. Dr. Tsourmas could not say whether C.S.F.'s mental health was the cause of N.E.'s April and May crises but testified that "it was a big stressor for her, and it was a big focus of her treatment while in the hospital."[7] Dr. Brothers agreed that a parent's refusal to deal with her own mental health issues, when those issues were negatively affecting her child, would endanger the child. Dr. Spraggins said, "Regardless of whether [C.S.F.] is experiencing mental health concerns, the fact remains that she takes no responsibility as a parent for her daughter's behavior, and instead blames her daughter's behavior on myriad external sources, including peers at school, social media, and other family members. Regardless of the cause of her daughter's issues, her daughter's recovery is likely to be negatively impacted by [C.S.F.]'s failure to consider how she may have contributed to her daughter's distress." Asked whether C.S.F.'s mental health was detrimental to N.E., Ramirez said, "That's such a broad statement. I think that under the current stress that she's under, she hasn't been able to demonstrate ongoing safe interaction, emotionally safe interaction with her daughter. I don't know what things look like in a different situation."

- Schrager testified that C.S.F. showed no signs of understanding that she might play a role in N.E.'s issues. Schrager said, "The only thing that I am terrified about is that [C.S.F.] is a person who did nothing but want for revenge. Not for [N.E.], but for herself." Schrager also said that when a child attempts suicide three times[8] and her parent still reports being entirely satisfied with her own life, that parent should not care for that child.

- Asked whether she had determined whether C.S.F.'s emotional state harmed N.E.'s welfare, McAlister said, "I was not able to determine that in our sessions." She believed that C.S.F.'s mental and emotional issues might have contributed to N.E.'s depression and anxiety. By the end of their sessions, C.S.F. was "starting to recognize that [N.E.] may have been overwhelmed" and recently stated that she wanted to learn how to help N.E. with that. McAlister saw some improvement in C.S.F.'s ability to respect boundaries with professionals,

---

[7] Dr. Tsourmas also said that the fact that N.E. has continued to suffer from psychiatric problems to such a degree that she has been placed in a residential treatment center raises concern that N.E. has significant stressors other than C.S.F.'s mental health.

[8] Schrager testified that C.S.F. told her that N.E. had actually attempted suicide three times.

9

"[n]ot all of the time, but a lot more of the time than previously," and to recognize and understand other people's feelings. She believed C.S.F. could continue to make slow progress if she continued with therapy.

- McAlister believed C.S.F. might have a "pervasive developmental disorder," perhaps along the autism spectrum, and her end-of-treatment report diagnosed C.S.F. as follows: "[rule out] Pervasive Developmental Disorder NOS," "Adjustment Disorder w/Anxiety," and "Parent-Child Relational Problem." McAlister recommended that C.S.F. continue therapy and consider further testing to determine whether she has a developmental disorder that interferes with her recognition of emotion.

- Saddy testified that C.S.F. was extremely motivated to get N.E. back and that her repetitive and tangential speech might be "ADHD-type symptoms." Asked whether C.S.F. had made progress "[g]iven the limited scope of what [C.S.F.] has wanted to work on" in their sessions, Saddy said, "Oh, a little bit." Saddy said he was willing to continue working with her "to the extent that I'm capable," explaining that his clinic did not do long-term, in-depth therapy. Saddy believed C.S.F. suffered from "anxiety, if anything," and did not see any reason to refer her for more intensive psychological or psychiatric care. He said that her "biggest concerns were anxiety over wanting to get her daughter back." He also said that he did not "badger" his patients or accuse them of lying about symptoms and that he "just sort of take[s] your word for it."

## Discussion

In arguing that the evidence is insufficient to show she suffers from a mental illness that makes her unable to care for N.E., C.S.F. notes that the doctors do not seem to have diagnosed exactly what disorder or disorders she suffers from and asserts that because the experts only talked about "best guesses" and testified that C.S.F. could make progress in addressing her mental problems, their testimony cannot support findings under section 161.003(a)(1) and (2).[9] *See* Tex.

---

[9] The standards for reviewing whether clear and convincing evidence supports a termination decree are well established. *See* Tex. Fam. Code § 101.007 (defining clear and convincing evidence); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (defer to jury's credibility decisions); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) (review of evidence); *In re C.H.*, 89 S.W.3d 17, 25-26 (Tex. 2002) (review of evidence).

Fam. Code § 161.003(a).  C.S.F. essentially seems to argue that because no expert directly stated, "Due to mental illness X, C.S.F. is an unfit parent and will never recover," the evidence is insufficient to support the jury's verdict.  We disagree.

In addition to the testimony summarized above, Bolich said she believed C.S.F. had mental illnesses that made her unable to care for N.E., basing that conclusion on the various professionals' reports and diagnoses and on her own observations of C.S.F. and N.E.  She also believed C.S.F.'s mental illness was likely to persist until N.E. was eighteen, saying, "I believe that [C.S.F.] has had this mental health issue for several years, and she continues to have it, and she's not recognizing it.  And so I believe she would continue to not address it, and deny these mental health issues, and it would not be appropriate for [N.E.] to be in her care."  N.E. testified that she loved her mother but did not believe that she could be healthy living with her if C.S.F. did not see to her own mental health.  Numerous mental health experts have evaluated and worked with C.S.F., the majority of those experts believe that C.S.F. suffers from some form of mental illness, and three of them believed she has schizoaffective disorder, bipolar type.  Others said they could not specify what illness or illnesses are involved because C.S.F. did not answer their questions honestly or fully.  Most of the experts testified that, no matter what the exact illness is, and despite her ability to provide for N.E.'s material needs, C.S.F.'s lack of empathy and inability to recognize and address her own issues has been detrimental to N.E.'s emotional well-being and renders C.S.F. unable to be an adequate parent. Furthermore, several experts testified that schizoaffective disorder, bipolar type, the illness they believe C.S.F. suffers from, is difficult to treat under the best of circumstances and that C.S.F.'s unwillingness or inability to recognize her own mental issues will make treatment more difficult and slow any progress.

11

The fact that some experts did not believe C.S.F.'s mental condition was as serious as others believed it to be does not invalidate the evidence supporting the jury's findings. Multiple experts provided testimony that C.S.F. suffered from some form of serious mental illness, multiple witnesses testified about C.S.F.'s unusual or inappropriate behavior and the distress her behavior caused N.E., and C.S.F. utterly denied that she had mental issues and was tangential and rambling in her testimony. Having carefully reviewed the entire record, we hold that the jury could have found, by clear and convincing evidence, (1) that C.S.F. suffered from a mental or emotional illness that made her unable to properly care for N.E.'s needs and (2) that her illness will, in all reasonable probability, continue to render her unable to care for N.E. until N.E. is at least eighteen years old. *See id.* § 161.003(a)(1), (2); *Salas v. Texas Dep't of Protective & Regulatory Servs.*, 71 S.W.3d 783, 790 (Tex. App.—El Paso 2002, no pet.) ("Section 161.003 does not require scientific certainty that Salas's mental illness will continue until the children are eighteen; it only requires reasonable probability."); *Spurlock v. Texas Dep't of Protective & Regulatory Servs.*, 904 S.W.2d 152, 158 (Tex. App.—Austin 1995, writ denied) ("The statute does not require scientific certainty, but rather reasonable probability."). We overrule C.S.F.'s first issue on appeal.

C.S.F. next argues that because the Department was unable to provide C.S.F. with a therapist who could meet C.S.F.'s needs, insufficient evidence supports a finding that the Department made reasonable efforts to reunite the family. *See* Tex. Fam. Code § 161.003(a)(4).

According to Bolich, C.S.F. started therapy in July 2013, shortly after N.E. was removed, and moved from therapist to therapist until she was "unsuccessfully discharged" in May 2014 by Katie Pendelton, who saw her after McAlister stopped seeing patients. At that point,

Bolich tried to refer C.S.F. to two other therapists, neither of whom had available openings, and a third refused to take C.S.F. as a patient, saying she did not want to risk being sued or having a complaint filed against her. C.S.F. then found Saddy on her own. Bolich said, "[W]ith the service plan, we've provided her with several providers that could help her with therapy, her psychological, psychiatric evaluations. Given her visits. [sic] I believe that, you know, we have tried to return her. But [C.S.F.] is unable to, I guess, appropriately address her needs."[10]

C.S.F. was allowed visitation, both supervised and unsupervised, which was often cut short and eventually halted altogether because of her refusal or inability to stop bringing up inappropriate subjects, making derogatory remarks about other people involved in the case, or otherwise causing N.E. distress. Her family therapy with N.E. was stopped for the same reason. C.S.F. was provided with numerous therapists, psychologists, and psychiatrists so she could address her own mental health issues, but when they made statements or diagnoses that she did not like, her pattern seemed to be to stop seeing the professional, file complaints with his or her licensing board, threaten to sue, and sometimes file suit. Several experts believed C.S.F. was not truthful in her answers during evaluations and therapy, and she did not comply with recommendations that she seek psychiatric care; indeed, C.S.F. refused to admit she had any disorder that might require such care. Although some therapists saw some progress, there was little evidence that C.S.F. had made significant improvement in addressing (or even acknowledging) her mental issues during this

---

[10] Bolich was asked why C.S.F.'s having gone to see three psychiatrists did not satisfy the Department's requirements, and she answered, "I don't believe that she was giving enough information to the psychiatrists to do an accurate evaluation, and so I don't believe she fully engaged in those services."

13

proceeding. Based on this record, the jury could have found by clear and convincing evidence that the Department made reasonable efforts to reunite her with N.E. *See id*.; *Liu v. Department of Family & Protective Servs.*, 273 S.W.3d 785, 795 (Tex. App.—Houston [1st Dist.] 2008, no pet.); Rodriguez v. Texas Dep't of Family & Protective Servs., No. 03-05-00321-CV, 2006 WL 1358488, at *7 (Tex. App.—Austin 2006, May 19, 2006, no pet.) (mem. op.). We overrule C.S.F.'s second issue.

In her third issue, C.S.F. argues that the evidence is insufficient to support the jury's finding that termination was in N.E.'s best interest, pointing to uncertainty about whether and when N.E. might be adopted, N.E.'s wishes to continue a relationship with her mother, evidence that C.S.F. brought N.E. to her therapy appointments and obtained her medications as directed, and several witnesses' testimony that C.S.F. loved and cared for N.E. and that they appeared to have a close relationship.

To be sure, there was considerable evidence that C.S.F. dearly loves N.E. and has worked hard to provide her with all her material needs. N.E. did testify that she loved her mother and wanted to continue to have a relationship with her no matter the outcome of this proceeding. Many witnesses testified that, in the years leading up to N.E.'s hospitalization, N.E. and C.S.F. seemed to have a very close and loving relationship. However, as detailed above, there were numerous witnesses who testified that C.S.F.'s mental issues had contributed to N.E.'s mental health crises and that C.S.F. would be unable to care for N.E. properly as long as she refused or was unable to address her issues. N.E., who has required hospitalization three times due at least in part to suicidal ideation, did not believe it would be safe for her to live with C.S.F. while C.S.F. refused to

14

address her mental health concerns and often became distressed or anxious before and after visits with C.S.F. The evidence was that N.E. requires a special kind of care and parenting, and numerous witnesses testified that C.S.F. was and continues to be unable to provide that kind of guidance. According to several witnesses, N.E. has made good progress at Settlement Home; is learning to self-regulate, react more appropriately, and process emotions; and continues to benefit from the on-going support she receives from living at Settlement Home. The Department eventually hopes to place her with an adoptive family or a family that is participating in Settlement Home's foster-to-adopt program. Based on this record and the factors we are to consider when weighing a best-interest determination, *see Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976), we hold that sufficient evidence supports the jury's finding that termination is in N.E.'s best interest, *see Liu*, 273 S.W.3d at 797-98. We overrule C.S.F.'s third and final issue.

## Conclusion

Having considered and overruled C.S.F.'s appellate issues, we affirm the trial court's decree terminating C.S.F.'s parental rights.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Bourland

Affirmed

Filed: March 13, 2015

15