

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| IN THE INTEREST OF: | § | No. 08-25-00074-CV |
| J.Z.A., | § | Appeal from the |
| a Child.[1] | § | 65th District Court |
| | § | of El Paso County, Texas |
| | § | (TC# 2023DCM4163) |

**O P I N I O N**

We are mindful of the profound challenges that parents with severe mental illness may face in providing a safe and healthy environment for their children, and we follow the guidance provided by the Texas Supreme Court in *In re R.J.G.*, 681 S.W.3d 370 (Tex. 2023), regarding terminations solely relying on Subsection (O) as the predicate ground. We recognize that we must not be mechanical in our analysis or rely on a "gotcha" technicality to terminate a parent's rights. We acknowledge that some parents, despite their struggles, make sincere efforts to comply with service plan requirements so they can reunite with their children. This case does not reflect that effort. Here, the severe mental illness of a parent created situations for her and her child that necessitated removal of the child. In this case, the parent refuses—defiantly—to address her mental

---

[1] We use the parties' initials to protect their privacy. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b).

illness with needed psychiatric care and medication even when she knows that is the reason for the removal and the reason for the visits with her child being restricted to video calls. Although parental rights are constitutional, they are not absolute, and "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent–child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

After receiving an initial intake alleging physical neglect by Appellant H.M., Mother of J.Z.A., the trial court terminated her parental rights in January 2025.[2] We affirm.

## I. BACKGROUND

### A. The Department's intervention

The Department became involved in April 2023 when it received its first intake alleging physical neglect of J.Z.A. by Mother. J.Z.A. and Mother had a verbal altercation after Mother called 911 because he refused to go to the hospital when she claimed he was sick. In another instance, the Department received a second intake for neglectful supervision and physical neglect. When first responders arrived at Mother's residence, Mother had a sign posted on her front door that read, "Enter if you enter this -- if you enter there is a chance you'll die." Shortly after, a third intake was received for neglectful supervision over concerns that Mother was displaying "bizarre behavior" and believed someone was poisoning her food and trying to kill her and J.Z.A. The Department ultimately found reason to believe for neglectful supervision.

On July 26, 2023, the Department filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship. The

---

[2] The trial court also terminated the parental rights of J.Z.A.'s father, B.J.A. Father is not a party to this appeal.

Department was awarded temporary managing conservatorship of J.Z.A. on that same date. The Department alleged Mother "has committed or will commit, by the time of the final hearing, any of the following acts or omissions[,]" listing Subsections (D), (E), (K), (N), (O), and (P) as the predicate grounds under § 161.001(b)(1) of the Texas Family Code. Tex. Fam. Code Ann. §§ 161.001(b)(1)(D), (E), (K), (N), (O), (P). The Department also alleged that termination would be in J.Z.A.'s best interest. As part of the Department's affidavit of removal, it stated:

> The Department has serious concerns for the safety and well-being of [J.Z.A.] in the care of [Mother] as she has admitted using marijuana, often traveling to New Mexico to obtain it, and has unattended mental health. She also refuses [to submit to] drug tests and complete services. [Mother] refuses to take protective actions for her child, leaving him in an area where neither of them feel safe . . . [Mother] was asked to do services repeatedly, and it was explained to her how each service related to child safety, permanency, and well-being.

With respect to the Department's reliance on Subsection (O) as a predicate ground, the petition did not specify which service plan requirement Mother failed to comply with, and it was never amended throughout the case. On August 16, 2023, the trial court issued a Temporary Order Following Adversary Hearing requiring Mother to "comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of the suit."

## B. The service plan

A service plan meeting was held, and Department caseworker Leslie Salas presented the proposed plan to Mother. Under the "Danger/Worry Statements" section of the service plan, the plan provided:

> The Department is concerned that [J.Z.A.] is not being provided with a safe wellbeing. The department is also worried [about] mother checking on [J.Z.A.]'s health pointing at injuries or illnesses that are not present. The department is also concerned by reports stating that mother might have mental health needs. The department is concerned that [Mother] may have unaddressed mental health needs that prevent her from taking full care of J.Z.A.

3

And under the "Goal Statements" section, the service plan provided that "Mother will address all mental health needs to assure she is able to provide care for [J.Z.A.] with a stable mental health."

The service plan also set out specific "Required Actions," which Salas reviewed with Mother as services she was obligated to complete. Mother was ordered to comply with a range of requirements, which we outline in brief below:

(1) Housing requirement: Obtain a stable home environment.

(2) Parenting class requirement: Actively participate in and complete parenting classes and utilize learned skills during visits with J.Z.A.

(3) Visitation requirement: Attend and actively participate in supervised visits with J.Z.A.

(4) Drug testing requirement: Submit to random drug testing as scheduled by the Department.

(5) Substance abuse requirement: Complete a substance abuse assessment.

(6) Psychological requirement: Undergo a psychological assessment and follow through with all recommendations of the psychiatrist.

(7) Mental health requirement: Complete a mental health assessment from La Mente and follow all recommendations by Emergence providers.

(8) Individual therapy requirement: Participate in individual therapy and follow through with all recommendations of the therapist.

(9) Psychiatric requirement: Complete a psychiatric evaluation and follow through with all recommendations of the psychiatrist.

(10) Caseworker meeting requirement: Attend monthly meetings with caseworker.

Mother agreed to the service plan and signed it on May 9, 2024. More specifically, the acknowledgment form Mother signed also outlined that her progress of the service plan would be evaluated as follows:

4

- Have I completed my tasks in the plan?

- Have I achieved my goals in the plan?

- Can I provide for the ongoing safety and well-being of my child[]?

Mother acknowledged what was required and signed the form. Throughout the duration of the case, several orders were issued finding that Mother had "demonstrated adequate and appropriate compliance with the service plan." On September 11, 2024, the trial court issued an order finding that Mother had "demonstrated partial compliance with the service plan."

## C. The final hearing

At the final hearing, the Department relied on Subsection (O) as the predicate ground for termination of the parent-child relationship and abandoned all other grounds. The final hearing unfolded in two parts. On January 16, 2025, the trial court conducted an abbreviated hearing. The Department called Salas, who briefly testified she had worked on the case since August 2023 and confirmed that J.Z.A. was eight years old and was living in a foster home. The trial court then adjourned, and the hearing resumed on February 24, 2025.

At the start of the February 24 hearing, counsel for Mother orally requested a continuance, explaining, "I'm asking for additional time. My client has completed a number of services. We would like additional time to continue and counseling with the other service[s]." The trial court denied the request and called the Department's second witness. Admitted into evidence were numerous exhibits of records detailing Mother's contacts with law enforcement, prior hospitalizations, and mental health services—primarily through Emergence Health Network—as well as documentation of her visitation with J.Z.A., prior court orders in the case, and her service plan. Father objected on hearsay grounds to Exhibit 13, El Paso Police Department records, which the trial court overruled. Father also objected to Exhibit 16, Temporary Orders Following

Adversary Hearing, and Exhibit 21, the Amended Permanency Order, which the trial court admitted after redactions were agreed upon. The remaining exhibits were admitted without objection.

### (1) Psychologist James W. Schutte

The Department's second witness, James W. Schutte, Ph.D., a psychologist, testified. Schutte performed a psychological evaluation of Mother on November 15, 2023, which lasted about an hour and a half; Mother was cooperative. Schutte diagnosed Mother with schizoaffective disorder, bipolar type. Schutte recommended that Mother receive a psychiatric evaluation to assess the need for medication to address mood instability, psychosis, and ADHD. He also recommended that she continue participating in mental health counseling, continue submitting to random drug testing, and take parenting and family violence classes as a victim.

Schutte explained that Mother was "clearly in need of psychiatric care to address the severe mental illness." He described Mother as acting "very agitated" during the evaluation and had "bizarre responses to questions." Mother exhibited signs of psychosis during the evaluation, which Schutte described as "delusional ideas, feeling that she has special powers or special perceptive abilities." In one instance, Mother told Schutte she needed the President of the United States to know she has ADHD, is overweight, and needs a gym membership. He observed her talking to herself and Mother reported that she is able to "perceive energy and perceive things that are going on miles away from her." According to Schutte, these were all signs that indicated she was suffering from severe mental illness and was in need of psychiatric care. When asked what Mother's prognosis would be if she did not receive psychiatric care, Schutte explained that "untreated severe mental illness such as schizoaffective disorder tends to worsen over time," and can lead to increased psychosis and delusions, possible hallucinations, worsening mood instability,

6

and decreased ability to care for oneself and others. He opined that it would be "highly unlikely" for someone with Mother's diagnoses to be able to parent if left untreated. Mother's mental illness is a "large distractor" for her and "would keep her from fully and safely parenting her child" because she is preoccupied with her own issues and functioning and if she exhibited "erratic or impulsive behavior around her child, that could certainly place her child at risk . . . for neglect or potential abuse."

Schutte did not know Mother's condition at the time of the final hearing, as it had been over 15 months since the evaluation he conducted on Mother, and he did not provide treatment to her following the evaluation. He said he did not believe Mother would be able to care for J.Z.A. as of the time of the evaluation, but when asked about her prognosis, Schutte explained that if Mother saw a psychiatrist to determine the appropriateness of medication for her conditions, continued with mental health counseling, took parenting and family violence classes, and abstained from illicit substances, "then certainly there would be reason to hope that she would be able to care for her child."

### (2) Psychiatrist Solomon Williams

The Department then called Solomon Williams, M.D., a psychiatrist who evaluated Mother on September 5, 2024. He described Mother as cooperative during the evaluation and diagnosed her with bipolar I disorder with a most recent episode described as manic with psychotic features, and cannabis use disorder in remission. He characterized bipolar disorder as involving alternating depressive and manic episodes. According to Williams, manic episodes may involve low energy, limited judgment and insight, and impulsive behavior, which can manifest as spending, lack of sleep, or risky decisions such as excessive drug use or experiencing delusions. He added that while

individuals may "be normal" between episodes, during an episode, "they can be quite dangerous" and "place themselves in danger or place whoever they are caring for in danger."

Williams testified Mother appeared to be partially remitted at the time of her evaluation and he was able to piece together what she was saying. Mother exhibited severe symptoms and made "a number of grandiose statements," such as believing she had the ability to heal herself and hear conversations between occupants of other vehicles while driving. Mother also exhibited symptoms of paranoia, believing she and J.Z.A. had been poisoned several times and raped by family members and daycare teachers. Mother also told Williams that she had previously been arrested for "singing loudly" and as a result of that incident, was hospitalized for about ten days; Williams testified he believed this was a manic episode.

Williams recommended continued drug testing and psychiatric care for the prescription of antipsychotic medication. When asked about her prognosis without medication, he testified that untreated episodes would likely persist and could lead to impulsive behavior, noting her judgment and insight would be limited during episodes. Regarding parenting, Williams expressed concern that untreated symptoms could impair her ability to provide safe care for a child. He explained that medication would help manage symptoms, support remission, and prevent the recurrence of episodes. In his view, therapy alone would not be sufficient, as medication is generally needed for bipolar disorder. When asked about her parenting ability, Williams responded, "It's difficult for me to answer that question because I did not examine her today. But if you are asking me a construct based on her bipolar disorder, if she does have an episode, and episodes are going to come, she will be a poor parent." At the time of the final hearing, about six months had passed since the evaluation, and Williams had not treated Mother or monitored her progress.

### (3) Caseworker Leslie Salas

The Department then re-called Salas. She testified about the original allegations of physical neglect and neglectful supervision. Some allegations were ruled out, but Salas stated that the Department found "reason to believe" for neglectful supervision. Salas met with Mother to review the service plan and identified parenting classes, random drug testing, psychological evaluation, mental health assessment, and substance abuse assessment as some of the requirements of the service plan.

Salas testified about Mother's compliance with the requirements outlined in her service plan. Salas reported that Mother completed parenting classes, was attending her twice-weekly visits with J.Z.A., completed monthly random drug testing, completed a substance abuse assessment, completed a psychological assessment, and was attending individual counseling with Dr. Ricardo Solis at BLS Counseling. As for the requirements Salas alleged Mother did not comply with, she testified Mother failed to secure stable housing, did not submit to a second substance abuse assessment, and did not complete mental health services or follow through with psychiatric treatment recommendations. According to Salas, "although she has been partially compliant, [Mother] has not demonstrated any changed behavior that led to the removal of [J.Z.A.]."

As for J.Z.A., Salas testified he was "thriving" in his foster home and was excelling in school. J.Z.A. was also taking medication for his ADHD diagnosis and was receiving therapy biweekly. Some of the therapy goals for J.Z.A. included reducing symptoms of trauma and anxiety. A January 2025 therapy note indicates that J.Z.A. had learned to "identif[y] triggers that had led to" certain "emotions such as 'my mom makes [me] stress.'" Although his foster family had not expressed interest in adopting him at the time of the final hearing, Salas testified that the Department's plan for J.Z.A. was unrelated adoption. The Department had spoken to a few family

9

members for placement, but only J.Z.A.'s maternal grandmother expressed interest. J.Z.A. had a relationship with his maternal grandmother, who cared for him for about a month after removal, but she lived in a senior housing facility where J.Z.A could not stay, and she was looking for alternative housing. J.Z.A. had been doing visits with his grandmother monthly in Mexico, but those visits stopped in October 2024 after J.Z.A. asked to end them.

### (4) Mother

The Department rested its case and Mother testified on her own behalf. Mother asked the trial court not to terminate her rights. She testified she ran a burrito business, with many of her sales being in New Mexico at dispensaries. Mother testified she obtained housing in January 2025 and provided her address to the court. She described the home as a two-bedroom apartment and stated it was suitable for her and J.Z.A. In addition, she confirmed that she completed parenting classes, did two substance abuse assessments, completed both a psychological and psychiatric assessment, and had been seeing Solis for counseling.

She also testified about a physical disability, and vaguely explained that issues with her back and other areas made it difficult to have a nine-to-five job. Mother stated that she had been denied disability benefits three times, and that her current application remained pending. If approved, she explained, the benefits would help her afford medical treatment and care for her and J.Z.A.

When asked about the services she was working on, Mother asked the trial court to order additional services:

[Counsel]: Are there any additional services that you have not obtained that you are working on obtaining?

[Mother]: There are farther [sic] greater things out there that we can do in this situation that haven't been done. For example, we can always work

10

> on one-on-one with me and [J.Z.A.], coming together in resolution. Solutions are farther [sic] greatly unnoticed in this case, and to me, that is very, very difficult to understand.

[Counsel]:    And ma'am, are you asking the Court to order those services?

[Mother]:    Correct.

[Counsel]:    And you're willing to participate in all of those services; correct?

[Mother]:    Whatever it takes for my child.

She further confirmed that she was requesting either the return of J.Z.A. to her care or, alternatively, that her rights not be terminated, and that the Department be named managing conservator with her as possessory. This arrangement, she testified, would allow her to continue working on her relationship with J.Z.A. and complete any other services required by the court.

When asked about the recommended medication, Mother claimed she had insurance-related issues as the reason she had not obtained medication. She initially stated that she did not have insurance and that she saw "no need to pay for that." However, later in her testimony, she confirmed she did have insurance coverage. Mother also claimed she had a physical illness that was a greater concern to her than her mental health issues. According to Mother, her physical pain is "so grand" that she needs to first address her physical health before her mental health. When asked directly whether she wanted to take medication, Mother responded, "No, I don't want to take it because it's unfair to say that you give me that first."

After all parties rested, the trial court orally ruled that Mother's parental rights were terminated for failure to follow a court order and that termination was in J.Z.A.'s best interest. The trial court signed its Order of Termination that same day, terminating Mother's parental rights under § 161.001(b)(1)(O) of the Texas Family Code and appointing the Department as permanent

managing conservator.[3] In its written Order, the trial court specifically found termination was in J.Z.A.'s best interest; Mother "failed to comply with the provisions of a court order that specifically established the actions necessary for [her] to obtain the return of the child;" [T]ermination was not based on evidence that [Mother] was "economically disadvantaged," and [Mother] "did not prove by a preponderance of evidence that [she] (1) was unable to comply with specific provisions of a court order; [or] (2) [that she] made a good faith effort to comply with the order and the failure to comply [was] not attributable to any fault of the parent." This appeal followed.

## II. APPLICABLE LAW AND STANDARD OF REVIEW

A parent's "right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *In re A.C.*, 560 S.W.3d 624, 629–30 (Tex. 2018) (citing *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982)). As both the United States Supreme Court and Texas Supreme Court have proclaimed, the termination of the parent-child relationship constitutes the "death penalty" of civil cases. *In re D.T.*, 625 S.W.3d 62, 69 (Tex. 2021). "Termination proceedings should [therefore] be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *In re B.L.M.*, 114 S.W.3d 641, 644 (Tex. App.—Fort Worth 2003, no pet.) (citing *Holick v. Smith*, 685 S.W.2d 18, 20–21 (Tex. 1985)).

The Department may remove an abused or neglected child and seek an emergency order for temporary possession. *See* Tex. Fam. Code Ann. §§ 262.001, 262.102. The Department must, within 45 days of being appointed as temporary managing conservator, prepare and file a service plan. *Id.* § 263.101. The service plan "shall be developed jointly by the child's parents and a

---

[3] Mother does not challenge the trial court's appointment of the Department as permanent managing conservator.

representative of the department." *Id*. § 263.103(a). It must be written "in a manner that is clear and understandable to the parent in order to facilitate the parent's ability to follow the requirements of the service plan." *Id*. § 263.102(d). Parents are required to sign the service plan, and "the court shall incorporate the service plan into the orders of the court and may render additional appropriate orders to implement or require compliance with the plan." *Id*. §§ 263.202(b-1), 263.103(b). The service plan may also be amended "at any time." *Id*. § 263.104(a).

Texas Family Code § 161.001 "balances the convergent and divergent interests of parent and child" and permits termination of a parent–child relationship only if (1) the parent's conduct satisfies at least one statutory ground for termination; and (2) termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2012). Due process mandates clear and convincing evidence for each element. *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019). Evidence is clear and convincing if it is of the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*.; Tex. Fam. Code Ann. § 101.007. A single predicate ground under Texas Family Code § 161.001(b)(1)(A)–(V) is sufficient to uphold termination on appeal, in addition to upholding a challenged best-interest finding. *N.G.*, 577 S.W.3d at 237. Nearly all grounds under § 161.001(b)(1) require proof that the parent has abandoned or endangered the child, or that the parent has engaged in specified criminal conduct; Subsection (O) is the exception. *In re R.J.G.*, 681 S.W.3d at 373.

Subsection (O) permits termination if the court finds, by clear and convincing evidence, that the parent failed to comply with the provisions of a court order that specifically outlines actions necessary for the parent to obtain return of a child who has been in the permanent or temporary managing conservatorship of the Department for not less than nine months due to removal of the

13

child for abuse or neglect of the child by the parent. Tex. Fam. Code Ann. § 161.001(b)(1)(O). Because Subsection (O) focuses on the parent's conduct after removal, it is a threshold requirement that there be evidence in the record showing that the removal of the child "was rooted in proper grounds" of "abuse or neglect."[4] *In re P.H.*, No. 05-22-00617-CV, 2022 WL 17663648, at \*3–4 (App.—Dallas Dec. 14, 2022, no pet.) (mem. op.) (reversing Subsection (O) termination where the record did not provide detail regarding the circumstances of removal to clearly and convincingly establish that the child was removed due to "abuse or neglect").

The Family Code also establishes a single affirmative defense to termination for noncompliance of a court order under Subsection (O). Tex. Fam. Code Ann. § 161.001(d). Under § 161.001(d), the parent must prove, by a preponderance of the evidence, that she was unable to comply with the court-ordered service plan, she made a good faith effort to comply with the order, and her failure to comply is not attributable to any fault of her own.[5] *Id.*; *In re B.J.F.*, No. 01-23-

---

[4] The Department contends that Mother did not challenge and therefore concedes that: "(1) the provisions of the court order established actions necessary for the child to be returned to [Mother]; (2) the child has been in the managing conservatorship of the Department for at least nine months; and (3) the child was removed for abuse or neglect." In her reply brief, Mother states she does not concede that "the provisions of the court order established actions necessary for the child to be returned" and "that the child was removed for abuse or neglect." According to Mother, "the allegations of abuse or neglect contained in the intake remain unproven on this record" and the "Department's failure to provide clear and convincing evidence establishing abuse or neglect justifying the initial intake is itself a form of reversible error." However, Mother did not raise this argument at the final hearing. Mother also did not raise this argument in her original brief and we therefore do not reach it. Although reply briefs may address arguments raised in the appellee's brief, "[t]he Texas Rules of Appellate Procedure do not allow an appellant to include in a reply brief a new issue in response to some matter pointed out in the appellee's briefs but not raised by the appellant's original brief." *Dallas Cty. v. Gonzales*, 183 S.W.3d 94, 104 (Tex. App.—Dallas 2006, pet. denied); *see* Tex. R. App. P. 38.3; *see also Fox v. City of El Paso*, 292 S.W.3d 247, 249 (Tex. App.—El Paso 2009, pet. denied) (a reply brief may not be utilized to present issues to the court that were not presented in the original brief).

[5] Although Mother asserts this affirmative defense on appeal, she has waived it because she did not raise it in the trial proceedings. *See In re A.M.*, No. 14-23-00415-CV, 2023 WL 7206735, at \*7 (Tex. App.—Houston [14th Dist.] Nov. 2, 2023, pet. denied) (mem. op.) (holding father waived § 161.001(d)'s affirmative defense "because he did not assert the defense in his pleadings or during trial and provided no evidence to support it"); *In re N.B.*, No. 12-22-00236-CV, 2022 WL 16843243, at \*3 (Tex. App.—Tyler Nov. 9, 2022, pet. denied) (mem. op.) (stating party waives § 161.001(d) defense by failing to plead it).

00522-CV, 2024 WL 117174, at *17 (Tex. App.—Houston [1st Dist.] Jan. 11, 2024, pet. denied) (mem. op.).

In *In re R.J.G.*, the Supreme Court clarified that "strict compliance with every detail of a service plan is not always required to avoid termination under (O)." *Id.* The Court established that a parent's failure to complete a requirement of a service plan may be sufficient to support termination under Subsection (O), so long as the requirement is specific and material. *In re R.J.G.*, 681 S.W.3d at 370; Tex. Fam. Code Ann. § 161.001(b)(1)(O). As to specificity, Subsection (O) permits termination only if the provision was "'specifically established' in the written court-ordered service plan." *In re R.J.G.*, S.W.3d at 373. A provision that is unwritten, supplied only by the caseworker's oral testimony, or that is vague, cannot support termination under Subsection (O). *Id.* Moreover, termination is not automatic or required when the Department properly proves a parent's noncompliance with a specific plan provision. *Id.* at 379 (citing Tex. Fam. Code Ann. § 161.001(b)(1)(O) ("The court *may* order termination of the parent-child relationship if the court finds by clear and convincing evidence . . . that the parent has . . . failed to comply[.]" (emphasis added)). If the noncompliance is "trivial or immaterial in light of the plan's requirements overall," termination is not appropriate under Subsection (O). *Id.* Termination is further "not warranted when a parent participates as the plan requires and the Department waits until trial to reveal that it was measuring performance against a previously undisclosed requirement." *Id.* In the end, "the trial court bears the ultimate responsibility for determining whether that finding supports termination." *Id.* at 379.

When the legal sufficiency of the evidence is challenged in a parental termination case, we review all the evidence in the light most favorable to the finding to "determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true."

15

*In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We defer to the factfinder's conclusions, indulge every reasonable inference supporting the finding, and presume the factfinder resolved any disputed facts in favor of the findings. *In re L.D.C.*, 622 S.W.3d 63, 69 (Tex. App.—El Paso 2020, no pet.). As a corollary to this requirement, we must disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

In a factual sufficiency review, we must likewise give due consideration to the evidence the factfinder could have reasonably found to be clear and convincing and determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth" of the allegations. *Id.* at 266. We must not substitute our judgment for that of the factfinder. *In re D.R.V.*, No. 08-22-00238-CV, 2023 WL 2544577, at *5 (Tex. App.—El Paso Mar. 16, 2023, no pet.) (mem. op.). The evidence is factually insufficient when, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction. *In re J.F.C.*, 96 S.W.3d at 266.

## III. ANALYSIS

In two issues, Mother challenges the legal and factual sufficiency of the evidence supporting termination of her parental rights, arguing that the Department failed to prove, by clear and convincing evidence, that (1) she failed to comply with a specific, material written requirement of the service plan under § 161.001(b)(1)(O) of the Texas Family Code, and (2) termination of her parental rights is in the best interest of J.Z.A.

### A. Subsection (O)

The evidence in this case is largely undisputed. Mother contends that she "substantially complied" with "seven of the 10 written directives set out in the service plan." While we agree that Mother complied with several of the plan's requirements, her complete failure to comply with a material requirement defeats her claim of substantial compliance. As the law makes clear, a parent "cannot overcome the complete failure to comply with a material requirement by arguing that performing other requirements constitutes substantial compliance with the plan overall." *In re R.J.G.*, 681 S.W.3d at 382. We take particular issue with Mother's refusal to seek psychiatric care and take prescribed medication as recommended, and with her conduct during visitations, both of which directly impacted her ability to safely and appropriately parent J.Z.A.

It is undisputed that Mother did not follow up to obtain the medication to treat her mental health diagnosis, as required by Requirements #6, #7 and #9. In fact, Mother testified at the final hearing that she does not want to take such medication. Nevertheless, she argues that the requirement to take medication was vague and unwritten, and she therefore cannot be held to its compliance. With regard to visitation, Mother contends there is "legally and factually insufficient evidence to show [she] failed to substantially comply with specific, material written directives set out in the Service Plan, as required by Subsection (O) and *In re R.J.G.*" The Department maintains that Mother's complete failure to begin the recommended course of psychiatric care and treatment constituted a material requirement. The Department contends that this failure contributed to the circumstances that led to J.Z.A.'s removal and that rendered visitation harmful to J.Z.A. throughout the case, providing legally and factually sufficient evidence to support the trial court's termination decision. We agree.

17

Contrary to Mother's assertion, this case presents the very scenario in which mental health recommendations—though arguably vague or non-specific when viewed in isolation—may be the most critical and material requirements for reunification when assessed under the totality of the circumstances. In this case, the evidence is sufficient to demonstrate that Mother's willful non-compliance support termination. Further, as discussed later, Mother's refusal to meet the requirements to address her mental health led to disrupted and concerning visits with J.Z.A. and her unwillingness to comply was evident at trial.

### (1) Psychological assessment (Requirement #6)

The service plan required:

> [Mother] will submit to a psychological assessment and follow through with all recommendations given to her by provider. She will sign all releases of information.

Mother completed a psychological assessment. What Mother did not do is "follow through with all the recommendations given to her by her provider." Schutte, the psychologist who assessed Mother, made the following recommendations:

> This client should receive a psychiatric evaluation to determine the appropriateness of medication to address mood instability, psychotic symptomatology, and ADHD. She should continue to receive mental health counseling to address her mood and coping skills and should continue to submit to random drug testing. She should also complete parenting classes as well as family violence classes as a victim.

Following Schutte's recommendation, Mother did submit to a psychiatric evaluation. She was evaluated by psychiatrist Williams on September 5, 2024, who then issued his own set of recommendations, which included the need for her to take medication. Mother contends that the service plan never converted these vague and non-specific recommendations into written, specific requirements of the service plan, and that following "the heightened standard" set out by the Court in *In re R.J.G.*, termination cannot be upheld for her failure to comply with these recommendations.

18

Mother also argues that she did complete a psychiatric evaluation, parenting classes, and individual therapy.

Although we recognize Mother's compliance with most of Schutte's recommendations, we find her failure to follow through with psychiatric care and prescribed medication to be a material violation. Importantly, Schutte's testimony was that *if* Mother saw a psychiatrist, who determined the appropriateness of medication for her condition, continued with mental health counseling, received parenting and family violence classes, abstained from illicit drug use, *and* her psychological condition could be stabilized, "then certainly there would be reason to *hope* that she would be able to care for her child" (emphasis added). According to Schutte's recommendation, "therapy alone is not enough to treat a severe mental illness such as schizoaffective disorder. Really, the primary treatment would be psychotropic medication." Mother failed to comply with this material requirement, and the trial court's termination order is properly upheld on this ground.

### (2) Psychiatric evaluation (Requirement #9)

Regarding the psychiatric evaluation requirement, the service plan provided:

> [Mother] will actively participate in a psychiatric evaluation. She will ensure that she follows through with all recommendations given by a psychiatrist. [Mother] will sign all release[s] of information in order for the Department to have contact with service provider regarding this service.

It is uncontested that Mother completed a psychiatric evaluation. The Department argues Mother violated this requirement because she failed to follow through with all recommendations of Williams, the psychiatrist. More specifically, the Department maintains that the "main recommendation by . . . Williams was for [Mother] to obtain psychiatric care, and particularly to take antipsychotic or psychotropic medication," which Mother failed to do.

Williams testified to his recommendations as follows:

19

I [recommend] care for psychiatry, she should begin one or the second generation antipsychotic medication to--Bipolar 1 symptoms. So that was my recommendation from a medication point of view, a second generation antipsychotic.

Under the "Recommendations" portion of his written report, Williams stated:

Under the care of a psychiatrist, [Mother] should begin one of the second-generation antipsychotic medications to target bipolar I disorder symptoms with plan to conduct the requisite metabolic side effects monitoring.

According to the Department, this recommendation is of "utmost importance for alleviating the concerns that led to J.Z.A.'s removal and continued placement in foster care" and her "refusal to seek psychiatric care and obtain necessary medication in this case is a complete violation of the most material provision of her service plan." The Department argues that "[t]his requirement is specifically established in her written court-ordered plan," as the plan contained the following language: "She will ensure that she follows through with all recommendations given by psychiatrist." In response, Mother asserts this requirement is "too vague under *R.J.G.* to create a mandatory medication requirement or make the recommendations of unspecific mental health professionals enforceable against her in the service plan under Subsection (O)."

Regarding an appointment for psychiatric services and medication, the record indicates that the Department referred Mother to La Mente in October 2024. When Mother missed that appointment, no other referral was made by the Department because La Mente required that Mother "make the appointment herself after that." It is undisputed that Mother knew she had to obtain psychiatric care. When questioned about psychiatric care and mental health medication at the final hearing, Mother gave inconsistent responses—citing her lack of insurance and claiming her physical pain prevented her from taking the medication. She deliberately skirted the question by suggesting there were financial and physical limitations. When specifically asked, "have you done anything about getting those medications that they suggested you be on?" she responded she

did not have Medicaid and saw "no need to pay for that." Yet, later in her testimony, she confirmed she had insurance coverage through BlueCross BlueShield. Salas also confirmed that Mother had obtained ADHD medication at the beginning of the case through Project Vida, which showcases her ability to access medication.

Throughout her testimony, Mother insisted she would not address her mental health until her physical disability was treated, despite not having a formal diagnosis for her physical disability and not seeking care from a doctor for her physical disability concerns. For example, during one exchange, the following occurred:

> [Counsel]: Ma'am, all of these reasons . . . why [J.Z.A.] was put into foster care could be addressed if you would see a psychiatrist. Do you realize that?
>
> [Mother]: Yes, but I want my physical illness [addressed] first. I need that checked out first, and I need all the specialists in the world to tell me what's really going on with my body.

And when asked to identify her physical illness, she could not provide an answer.

The issue is not that the Department preferred one medication over another, or one form of psychiatric care over another, or that Mother was unaware of the requirements. Rather, the record shows that Mother intentionally refused to comply with what she knew was required and what the court ordered her to "ensure that she follows through" on. Far from failing under *In re R.J.G.*, this case illustrates how a non-mechanical analysis of both Mother's compliance and non-compliance supports the termination decision. Even under Mother's interpretation of *In re R.J.G.*, the case establishes that the evidence must show: (1) a written directive existed, (2) the parent violated that directive, and (3) the directive was so material to the service plan that, when evaluated under the totality of the circumstances, the violation justified the extraordinary remedy of terminating a constitutional right. *See In R.J.G*, 681 S.W.3d at 373.

21

We further reject the argument that termination under Subsection (O), based on non-compliance with the mental health recommendations provided by appropriate experts, requires that those recommendations be itemized in the service plan to include specific, named medications, dosages, treatment dates, times, and providers. A service plan directing a parent to "actively participate in a psychiatric evaluation" and "follow[] through with all recommendations given by a psychiatrist," may be adequate and appropriate given the nature of psychiatric care—mental health needs evolve, medications are often adjusted, added, or discontinued, and dosages are modified to meet the patient's needs. Accepting Mother's argument—that *In re R.J.G.* requires mental health recommendations to be reduced to the specific then-current diagnoses, medications, and treatment plan—would suggest that parents with mental illness whose untreated conditions cause endangerment or neglect of their children could ignore expert recommendations and thereby leave children exposed to continued harm to their well-being.

Accordingly, the Department has proven by clear and convincing evidence that Mother failed to comply with this material requirement, and the trial court's termination order is properly upheld on this ground.

### (3) Mental health assessment (Requirement #7)

The service plan specifically provided:

> [Mother] will submit to a mental health assessment from La Mente. She will follow all recommendations by Emergence providers. [Mother] will sign releases of information.

The Department concedes that "[Mother] completed a psychological evaluation and a psychiatric assessment," but maintains that "these are separate directives from the requirement to complete a mental health assessment." It is undisputed that Mother was assessed by two qualified mental health providers—Williams, a psychiatrist, and Schutte, a psychologist. In evaluating the

22

nature and degree of the noncompliance under the totality of the circumstances, this record supports termination where the evidence demonstrates that the objective of the requirement—obtaining a mental health assessment by a mental health provider and engaging in mental health treatment—was not met. *See In re R.J.G.*, 681 S.W.3d at 381 (finding that termination of the parent-child relationship under Subsection (O) "requires a nuanced assessment of the parent's conduct and progress toward plan completion in light of the totality of the plan's requirements and overall goal").

While we find that the mental health assessment requirement could be met by the two evaluations conducted by Schutte and Williams, there is a reason that non-compliance with this directive is material—it was at La Mente where it was expected that psychiatric services would be provided, and medication would be prescribed. Mother failed to attend the appointment that Salas scheduled for her, and when Salas attempted to reschedule the appointment, La Mente did not allow it. Because of the missed appointment, Mother was required to reschedule the appointment herself, but she never did.

One of Mother's responses during her testimony regarding her failure to take medication was that the doctors "have no idea what I'm carrying on my shoulders every day when it come to the physical aspect of my disability." She further stated that there was "no need to pay" for the psychotropic medication both Schutte and Williams recommended. And when asked directly whether she wants to take psychotropic medication, Mother outright said: "No, I don't want to take it because it's unfair to say that you give me that first." When asked whether she understood that the reasons the Department removed J.Z.A. could be addressed if she began treatment with a psychiatrist, Mother admitted: "Yes, but I want my physical illness [addressed] first."

23

We recognize that even when the Department properly proves noncompliance with a specific requirement of a service plan, "termination is not automatic or required." *In re R.J.G.*, 681 S.W.3d at 379. ("[E]ven if the Department proves by clear and convincing evidence that a parent failed to comply with a requirement 'specifically established' in the written plan, that requirement may be so trivial and immaterial, considering the totality of what the plan requires, that the parent's noncompliance does not justify termination."). *Id.* At 373. Here, the required psychiatric care and medication intended to give Mother a chance at providing a safe and healthy environment was neither trivial nor immaterial. On the contrary, psychiatric care and medication was the critical requirement of Mother's service plan, and it was neither vague nor unwritten. Mother's mental health history shows that she has long been aware of her bipolar diagnosis and has articulated the behaviors she experiences during episodes—such as increased aggression and engaging in criminal and risky behavior—has at times denied her diagnosis, and has experienced multiple hospitalizations during manic episodes, including for suicidal ideations. She has taken psychotropic medication in the past, but never took them as prescribed or consistently. Accordingly, the Department has shown by clear and convincing evidence that Mother failed to comply with this material requirement, and the trial court's termination order can be upheld on this ground.

### (4) Visitation (Requirement #3)

Mother was also required to attend visitation with J.Z.A. In setting out this requirement, the service plan stated:

> [Mother] will consistently attend and actively participate in supervised visits with her child. Visits will be supervised by either a representative of the Department or a contracted provider. [Mother] will comply with the times of the visits and with the rules of the facility in which the visits are being held. [Mother] understands that any concerns observed during the visits will be addressed by the visitation monitor.

24

The caseworker will make unannounced appearances during the supervised visits and will supervise visits on occasion. The caseworker will address visitation expectations with [Mother] and visitation monitor will provide [Mother] with a visitation form giving her feedback on each visit. The caseworker will address any concerns pertaining to the interactions between mother and son with [Mother] after the visit.

The Department does not contest Mother's participation in visitation, but argues Mother violated this requirement because her "behaviors during visitation, such as speaking about the case or sexual abuse to J.Z.A., demonstrate a failure to apply skills learned from parenting classes." The Department further complains that "visits with J.Z.A. routinely did not last for the duration of their scheduled time." Salas testified visits lasted between 45 minutes and 1.5 hours because either Mother or J.Z.A. would "sometimes" end the visits early. Although the service plan required that Mother "comply with the times of the visits," it did not specifically establish a requirement that each visit last the full two hours or be of a specific duration.

However, we cannot disregard that visitation was regularly cut short due to Mother's behavior. While the decision to end a visit due to Mother's behavior is subjective, allowing J.Z.A. to be exposed to inappropriate discussions of a sexual nature, or to become upset due to Mother's behavior, is precisely why visitation was monitored. In this case, it is undisputed that Mother created harmful, disturbing situations and frequently did not participate in the full visitation permitted because she lacked insight into proper parenting behavior.

At the time of the hearing, the visitations were virtual due to an incident with Mother during a supervised visit in August 2024. That visit occurred at a McDonald's, where J.Z.A. had a slight cough. According to Salas, Mother became upset about the cough and accused the Department of denying J.Z.A. medical care. She called 911 and requested that paramedics evaluate J.Z.A. and take him to the hospital. The incident upset J.Z.A. and prompted Salas to end the visit. Paramedics

25

cleared J.Z.A. and confirmed he did not require medication. Mother then refused to allow Salas to leave with J.Z.A., forcing Salas to call the police. After they left McDonald's, Mother followed Salas and J.Z.A. in her car. Salas had to stop at the nearest police station, where officers intervened by blocking Mother's car to allow Salas to leave safely. Following this incident, the trial court suspended in-person visitation and ordered virtual visits until Mother completed her psychiatric evaluation and began treatment.

In another incident, which occurred shortly before the hearing, Mother expressed concern during a visit that J.Z.A.'s teeth were not falling out properly because he had allegedly been sexually abused and needed his teeth pulled. Salas also testified that Mother was regularly concerned with J.Z.A.'s health and "constantly" insisted he needed to be on antibiotics, even when there was no medical indication to support her concerns.

Mother agreed "there have been times where [J.Z.A.] doesn't want to visit with [her]" as well as "times where he has wanted [her] to change subjects and just have a normal visitation[.]" By Mother's own admission, J.Z.A. did not feel positive about their visits and either he verbalized, or she recognized, that the visits were not normal. Regarding J.Z.A.'s desire for "normal visitations," Mother responded: "I think that people don't realize that [J.Z.A.] is more mature than they realize. I think he's not a child and he's never been a real child before, even since he was nine months. And that was not because of me. He's never had what he should have had." This response reflects Mother's lack of accountability and insight—consistent with the doctors' opinions. We hold that legally sufficient evidence supports the finding that Mother failed to exercise parenting skills during visitation and that termination is justified on this ground.

### (5)   Other requirements

It is true that Mother substantially completed most of the remaining requirements of her service plan and throughout the case the trial court issued orders finding that Mother "demonstrated adequate and appropriate compliance with the service plan." However, *In re R.J.G.* dictates that a parent "cannot overcome the complete failure to comply with a material requirement by arguing that performing other requirements constitutes substantial compliance with the plan overall." *Id.* at 382. Having found that Mother failed to comply with her service plan by refusing to obtain psychiatric care, including prescribed medication, and by failing to comply with visitation requirements, we address the remaining "failed" requirements briefly.

### (a)   Housing (Requirement #1)

The Department does not dispute that Mother had obtained housing as of the final hearing. Instead, the Department contends that Mother violated this requirement because she "admitted she purposely did not provide Salas with her new home address, which prevented Salas from being able to visit and conduct a health and safety check on [Mother's] home." Salas testified she did not know where Mother was living at the time of the final hearing and claimed Mother refused to tell her. However, Mother testified she had secured public housing and had been living in a two-bedroom apartment since January 17, 2025. Mother provided her address in open court and stated her home was appropriate for her and J.Z.A.

While Mother acknowledged that she refused to give her address to Salas, she did obtain housing as required, and the Department waited until the final hearing to reveal that it was unable to perform a health and safety check on Mother's home. *In re R.J.G.* made clear that a Subsection (O) termination is not justified for technical noncompliance when the underlying substantive requirement has been satisfied. *In re R.J.G.*, 681 S.W.3d at 382. Mother's testimony

that she had suitable housing at the time of trial was not contested at the hearing, and as a reviewing court, we must consider undisputed evidence that contradicts the trial court's finding. *In re A.C.*, 560 S.W.3d at 630. As such, the Department has not established, by clear and convincing evidence, that Mother failed to obtain stable housing for J.Z.A, and the trial court's termination of the parent-child relationship cannot be upheld on this ground.

### (b) Parenting class (Requirement #2)

Salas confirmed that Mother completed the parenting class—although Salas had not been provided with the completion certificate, the class had just been completed the Saturday before the final hearing and 3–4 referrals had to be made before Mother completed the class. The trial court's termination of the parent-child relationship cannot be upheld on this basis.

### (c) Substance abuse assessment (Requirement #5)

Salas testified there were concerns for marijuana use and Mother was required to complete a substance abuse assessment. Salas confirmed Mother completed the substance abuse assessment in June 2024. Salas testified, however, that she sent Mother for a second substance abuse assessment in November 2024, which Mother did not complete. She also testified that Mother did not complete substance abuse treatment of any kind.

The service plan did not specifically establish requirements that Mother undergo a second substance abuse assessment, nor did it require completion of substance abuse treatment. There is also no evidence in the record indicating that the assessor recommended a second assessment. On the contrary, Salas confirmed during cross-examination that the only recommendation made by the assessor was continued therapy, a requirement the evidence shows Mother met. Accordingly, the trial court's termination of the parent-child relationship cannot be upheld on this basis.

**(d) Individual therapy (Requirement #8)**

Salas testified Mother was seeing Solis for individual therapy at BLS Counseling. Mother confirmed this and testified she was still seeing Solis at the time of the hearing. Although Salas conceded that Mother participated in individual counseling, she testified that Mother failed to provide a certificate of completion.

Mother's technical failure to provide a certificate of completion, however, cannot support termination under Subsection (O). The Texas Supreme Court has explicitly rejected the notion that technical noncompliance warrants termination, cautioning that "a court's decision to impose [termination] demands more than bureaucratic or mechanical box-checking." *In re R.J.G.*, 681 S.W.3d at 381. It is undisputed that Mother engaged in individual therapy and the lack of a certificate does not constitute a violation of the requirement. *See id.* at 382 (finding that "the caseworker's bare assertion that she 'does not have' a piece of paper proving completion . . . even if technically required by the plan, cannot support termination when there is other evidence that the classes were completed"). We therefore find that the trial court's termination of the parent-child relationship cannot be supported on this basis.

We emphasize that "this is not a self-inflicted termination case (drugs, violence, malice, etc.) of the sort that Texas courts so often confront." *In re G.A.M.*, 692 S.W.3d 336, 342 (Tex. 2024) (Young, J., concurring). And while "[m]ental illness of a parent is not, in and of itself, grounds for termination of the parent-child relationship[,]" Mother's mental illness must not go untreated if the illness prohibits her from providing for the ongoing safety and well-being of J.Z.A. *Liu v. Dep't of Family & Protective Servs.*, 273 S.W.3d 785, 791 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (citing *Carter v. Dallas Cnty. Child Welfare Unit*, 532 S.W.2d 140, 141–42 (Tex. App.—Dallas 1975, no writ)). With respect to Subsection (O), the Texas Supreme Court has

emphasized the need for courts to "find a solution short of termination—the worst sanction a parent can receive, one we properly call the death penalty of civil cases—when a loving parent's chief flaw is, to quote the statute, a 'mental deficiency' over which she has no control"). *In re G.A.M.*, 692 S.W.3d at 337 (Young, J., concurring). The Court has expressed a preference for alternatives to Subsection (O) terminations in cases involving nonviolent parents with mental illness who, despite limited means, are actively engaged in efforts to reunify, express a continued desire to remain involved in their child's life, and do not suffer from mental or developmental conditions that are unlikely to improve before the child turns 18—circumstances that would otherwise warrant termination under Tex. Fam. Code Ann. § 161.003(a). *In re G.A.M.*, 692 S.W.3d at 337 (Young, J., concurring).

We also recognize the harshness of terminating the parental rights of an individual with mental illness who substantially complied with many of her service plan requirements. In this case however, Mother's mental illness is so severe that psychiatric treatment and medication are her only path to safely and successfully parent her child on an ongoing basis. This is not a case in which Mother was unable to comply—a circumstance that might constitute a true affirmative defense in a different case. Here, the evidence shows that Mother was capable of complying with difficult requirements and demonstrated cooperativeness in doing so, yet she knowingly and intentionally refused to do the most material thing necessary to ensure J.Z.A.'s safety and well-being. When asked at the final hearing whether she understood that her statements and behavior—such as claims that people were trying to kill her and J.Z.A.—contributed to J.Z.A.'s removal from her custody, she responded: "You know what, I do understand that, but I do also understand that nobody leaves this world without paying their dues, and that's God."

Our decision takes into account the Supreme Court's directives in In re R.J.G. and In *re A.C.*; we do not apply a formulaic, mechanical analysis of service plans requirements. In protecting the essential emotion and physical needs of J.Z.A., we apply the heightened clear and convincing burden of proof to find that Mother's intentional and knowing refusal to address her mental health was a rejection of her best ability to successfully parent J.Z.A. We do not hold that termination of Mother's parental rights is required because she failed to "strict[ly] compl[y] with every detail of a service plan." *In re R.J.G*, 681 S.W.3d at 379. Mother's refusal to follow through with psychiatric care and the recommendation to take medication to address her mental health—as recommended by two experts, whose recommendations were written and compliance therewith was required under the service plan—is the type of material violation that justified termination under the totality of the circumstances. *Id*. Further, Mother's failure to comply with that material requirement continued to expose J.Z.A. to disturbing and stressful visits with Mother.

In sum, we hold the evidence is legally sufficient to support termination by clear and convincing evidence under Subsection (O). Mother's first issue is overruled.

## B. Best interest

To support termination of parental rights, the law requires both clear and convincing evidence of at least one predicate finding, and that termination is in the child's best interest. Tex. Fam. Code Ann. §161.001; *In re R.J.G.*, 681 S.W.3d at 377. In determining whether the evidence is sufficient to affirm the trial court's finding that termination is in the child's best interest, we employ the *Holley* factors. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Those factors include:

> (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the

programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals . . . ; (G) the stability of the home . . . ; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent.

*Id*. These factors are not exhaustive, and a court may consider other factors. *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.). Additionally, evidence of each factor is not required to terminate the parent-child relationship and the focus for this determination is on the child, not the parent. *Id*.

### (1) The Child's desires (*Holley* Factor #1)

We begin with the child's desires. At the time of trial, J.Z.A. was eight years old and had been in the Department's care for at least a year and a half. When a child is too young or unable to express his desires, the factfinder may infer those desires from the evidence. *In re K.M.*, No 07-16-00120-CV, 2016 WL 3660076, at *4 (Tex. App.—Amarillo, June 29, 2016, pet. denied) (mem. op.). Evidence that a child is bonded with a foster family and is well cared-for by them may also be considered. *In re S.J.R.-Z.*, 537 S.W.3d 677, 693 (Tex. App.—San Antonio 2017, pet. denied). The court may also consider evidence regarding the nature of the parent's visits and the impact the frequency or consistency of those visit has on the parent-child relationship. *In re J.S.*, 675 S.W.3rd 120, 130–31 (Tex. App.—Dallas 2023, no pet.). There was evidence that J.Z.A. was doing very well in his foster home and was thriving. He was excelling in school, had learned to read, was receiving tutoring services, was on ADHD medication, and was visiting his therapist biweekly. In notes from his therapy sessions, foster mom reported concerns for J.Z.A.'s emotional well-being after his visitations with Mother. Foster mom reported that Mother "puts to[o] much pressure on him. [H]e doesn't even want to talk to her anymore. Last time, she was asking him if he wanted to be adopted and leave her." Foster mom also reported that J.Z.A. "has been looking down and

overwhelmed after his visits with his (bio) mom. He keeps all his feelings to himself but, he looks overwhelmed." When asked to draw a picture of what makes him happy during a session, J.Z.A. drew a scene "in which he was playing with his foster brother."

Mother argues that this factor is neutral against her because J.Z.A. did not testify and because Mother remained active in J.Z.A.'s life and consistently exercised visitation. *In re G.M.,* 649 S.W.3d 801,811 (Tex. App.—El Paso 2022, no pet.). Mother also argues that because J.Z.A. did not testify, there can be no negative "desires-of-child" factor weighed against her. However, Mother would have us ignore the undisputed and admitted testimony that while consistent with visitation, Mother's visits were routinely cut short and plagued by Mother's inappropriate behavior.

During the McDonalds visit, paramedics were called because Mother insisted that J.Z.A. was ill. Salas testified this upset J.Z.A. and she ended the visit. Salas reported that J.Z.A. "was very anxious and scared during this visit. [He] cried the entire time[.]" Subjecting J.Z.A. to this unwarranted "emergency" when he did not require emergency attention is an example of how Mother's untreated mental illness resulted in harm to J.Z.A. Also uncontroverted is testimony that Mother proceeded to follow J.Z.A. and Salas in her car and police had to intervene to bring a safe end to that visit. After this incident, the judge ordered that visitation remain virtual until Mother obtained psychiatric care. Mother argues that this behavior is not "dangerous" and is only evidence of emotional conduct. Mother also argues that the Department lacks a permanency plan, which she contends weighs against a best interest finding. However, J.Z.A. is currently in his third foster home, and although there was no finalized permanency plan as of the final hearing, the Department is pursuing unrelated adoption. Mother undisputedly made consistent efforts to visit with J.Z.A. and continues to seek services to support reunification. But what Mother fails to acknowledge is

33

that her behavior caused the disruption leading to the second and third foster home placements. Salas testified as follows:

[Counsel]: So why is it that he went through two other homes before this one?

[Salas]: They were due to instances with [Mother].

On balance, the evidence related to this factor supports the trial court's best interest finding—or, at worst, is neutral.

### (2) Current and future physical and emotional needs (*Holley* Factor #2)

The next factor is the child's emotional and physical needs now and in the future. *Holley*, 544 S.W.2d at 371–72. The need for permanence is a paramount consideration for this factor. *In re R.A.G.*, 545 S.W.3d 645, 653 (Tex. App.—El Paso 2017, no pet.). While J.Z.A. had previously struggled with ADHD and reading, he had learned to read and was thriving in his foster home. The therapy notes from J.Z.A.'s sessions reflect that he "has shown improvement by feeling anxious less often during the day, feeling better able to manage daily tasks, increasing ability to pay attention, increasing levels of insight, increasing ability to regulate emotion, decreasing impulsivity as reported by foster mom."

Mother believes J.Z.A. has "extreme ADHD," dyslexia, and autism. The undisputed evidence is that while Mother may be aware of J.Z.A.'s needs, she often exaggerated physical concerns for J.Z.A., which led to demands for antibiotics, unnecessary medical examinations, and disturbing visits with J.Z.A.

Schutte testified that "[l]ongitudinal studies of individuals with schizoaffective bipolar disorder have found *absent treatment* their symptoms tend to worsen over time." (emphasis added). Because Mother's mental illness remained untreated, it would distract from and limit her ability to focus on the needs and care of J.Z.A. In fact, the uncontroverted evidence shows that Mother

34

believed she was protecting her child by threatening to kill individuals who tried to enter her home. When asked at the final hearing regarding the note she left on her door threating to kill those who entered, Mother responded as follows:

[Counsel]:  And ma'am, you did write that note your door, correct?

[Mother]:  Yes, and I think they got the memo.

Mother also believed that maintenance men were trying to poison and kill both her and J.Z.A., and that both she and J.Z.A. had been raped by family members and daycare teachers.

Williams testified that Mother's history of encounters with law enforcement and CPS, her prior hospitalizations during manic episodes, as well as driving under suspicion of use of drugs with her child in the vehicle, would be ongoing unless Mother began to take antipsychotic medication. As Williams explained, "people with manic episodes have very limited judgment and poor insight, so that's a danger of bipolar disorder." The evidence in this case supports the trial court's best interest finding, as Mother refused to acknowledge her mental illness or seek treatment—a refusal that formed the basis for J.Z.A.'s removal. Mother also acknowledged that her participation in visitation continued to include behaviors that resulted in shortened visits, required police intervention, and ultimately led to the suspension of in-person visits. This factor supports the trial court's best interest finding.

### (3)  Current and future emotional and physical danger (*Holley* Factor #3)

Williams testified that without medication, it is very likely that Mother would continue to experience manic episodes, creating the possibility of placing J.Z.A. in dangerous situations. Both Schutte and Williams testified that Mother's ability to successfully parent would be severely limited unless she stabilized her mental health, which required medication.

35

Medical records show that J.Z.A. was being treated for trauma and he reported, "my mom makes [me] stress." J.Z.A. was documented as exhibiting "clinically significant" symptoms that caused him "distress and impairment in functioning as evidenced by feeling overwhelmed" during visits with Mother. Another medical record indicates that Mother herself reported she "becomes aggressive during her manic episodes." Additionally, J.Z.A. expressed that he did not want to talk to Mother because "she gets mad at him during their meetings."

Mother's medical history also includes statements in which she admitted to using physical discipline. Records reflect that Mother stated she "has spanked and hit her son because 'that is the only way he learns, through pain.'" Another report quotes her as saying she "gets mad at her son all the time to a point she has to spank him as she believes [it] 'is the only way he understands, through pain.'" She also reported that she "has hit her son because he has sexually touched her and she was disciplining him."

Further relying on the same evidence that supports *Holley* Factor #2, this factor also supports the trial court's best interest finding—or, at worst, is neutral.

### (4) Parental abilities and available programs (*Holley* Factors #4 and #5)

We next consider the fourth and fifth *Holley* factors together. The fourth factor is the parenting abilities of the individual seeking custody, and the fifth factor examines the programs available to assist those individuals in promoting the child's best interest. "In determining the best interest of the child in proceedings for termination of parental rights, the trial court may properly consider that the parent did not comply with the court-ordered service plan for reunification with the child." *In re G.C.S.*, 657 S.W.3d 114, 135 (Tex. App.—El Paso 2022, pet. denied). Mother complied with several plan requirements despite her mental illness—parenting classes, substance abuse assessment, drug testing, two psychological assessments, individual counseling and

36

obtained housing. Yet Mother's refusal to take mental health medications and the fact that it resulted in continued stressful, shortened, and negative visitation experiences argue against her. The evidence on these factors supports the trial court's best interest finding.

### (5) Plans for child and stability of home or proposed placement (*Holley* Factors #6 and #7)

We next consider the sixth and seventh factors. The sixth factor examines the plans for the child by those seeking custody, and the seventh factor is the stability of the home or proposed placement. *Holley*, 544 S.W.2d at 371–72. Mother lived in a two-bedroom apartment since January 17, 2025. While Mother presumably had an appropriate home for J.Z.A., Mother understood that she needed additional services and was willing to accept the Department to retain managing conservatorship in order to complete those services. Mother testified that she earned money selling burritos at New Mexico dispensaries and that she was working on obtaining disability benefits, which she believed would help her financially support J.Z.A. and potentially qualify him for benefits as well.

The Department's plan for J.Z.A. was unrelated adoption. Although there had been a plan to place J.Z.A. with his maternal grandmother—whom he knew and had a relationship with—that plan fell through because she lived in a senior housing unit where children were not permitted to reside. As of the final hearing, maternal grandmother remained interested in placement and was trying to find alternative housing. Although J.Z.A.'s current placement was a foster-to-adopt home, the foster parents were not actively exploring adoption as of the final hearing. Consideration of this factor is neutral.

### (6) Acts and omissions (*Holley* Factor #8)

The eighth factor considers the parent's acts or omissions which may indicate that the parent-child relationship is not a proper one. *Holley*, 544 S.W.2d at 371–72. In reviewing the parenting abilities, the factfinder may consider the parent's past neglect or past failure to meet the physical and emotional needs of the child. *In re G.C.S.*, 657 S.W.3d at 134. A factfinder can also "infer from a parent's failure to take the initiative to utilize the available programs that the parent did not have the ability to motivate herself in the future." *In re K-A.B.M.*, 551 S.W.3d at 289.

Here, the uncontroverted evidence shows that Mother's failure to engage in psychiatric care and take prescribed medication leaves her in the same condition as when the Department removed J.Z.A. Mother continues to lack insight into her mental illness, has failed to address it, and, according to the evidence, will likely continue to expose J.Z.A. to unstable, harmful, and stressful situations without treatment. This factor supports the trial court's best interest finding.

### (7) Excuses for the parent (*Holley* Factor #9)

The ninth factor is whether there is any excuse for the parent's acts or omissions. Mother argues that this factor weighs in her favor because any "faults" are due to financial constraints, not bad parenting. However, the record does not support this claim. There is no evidence that Mother lacked the ability to attend appointments; in fact, she attended two mental health evaluations, a substance abuse assessment, regular in-person visitation—until they were ordered to be virtual— and drug testing. Although she deflected direct questions about her refusal to take mental health medication by citing insurance issues and an alleged physical disability, the record makes clear that no valid excuse prevented her from obtaining psychiatric care and medication. She simply refused. Her mental health history shows that she has had prescribed medication for both her ADHD and bipolar diagnoses since at least 2015, but she "does not believe she needs psychiatric

38

help and refuses to ta[k]e medications." A 2022 medical report further reflects that she has a history of bipolar disorder, but "has been without psychiatric treatment since 2020." Another medical report states that Mother reported concerns "about no[t] wanting to be medicated because she has gone through so many and does not want to be attended anymore." Mother's awareness of her diagnoses, her capacity for medication access and compliance, and her ongoing refusal to take prescribed medication to address her condition, is well established in the record.

After considering the entire record and reviewing the *Holley* factors, we conclude that the trial court's finding that termination is in J.Z.A.'s best interest was supported by legally and factually sufficient evidence. Mother's second issue is overruled.

## IV. CONCLUSION

For these reasons, we affirm.

MARIA SALAS MENDOZA, Chief Justice

July 31, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

39